LILLY SEILER, *et al.*, MINORS BY THEIR NEXT FRIEND, Appellees, v. THE ECONOMIC LIFE ASSOCIATION OF CLINTON, IOWA, Appellant.

**Insurance:** COPY OF APPLICATION. The attachment to an insurance policy of a copy of the application, followed by the word "signed,"

but without the signature of the applicant, does not entitle the company to rely on any part of such application, under Acts Eighteenth General Assembly, chapter 211, section 2, providing that all insurance companies shall on the issue of any policy attach thereto "a true copy" of any application and that if it neglects to do so it shall be forever precluded from pleading, alleging or proving such application or any part thereof.

FORFEITURE: *Suicide.* Where a life insurance policy contains no stipulation as to suicide and is taken out in good faith, it is not avoided, as against a *beneficiary* named therein, by the fact that assured, while sane, purposely took his own life.

Instructions: HARMLESS ERROR. An instruction that fraud might be proved by circumstances from which the inference of fraud is *irrisistible* is harmless, where it is so qualified by succeeding instructions that the party seeking to prove fraud could not be prejudiced.

*Same.* Error in giving instructions, or refusing the defendant the opening and closing, is harmless, where the case might have been taken from the jury.

*Appeal from Clinton District Court.*—HON. P. B. WOLFE, Judge.

FRIDAY, APRIL 8, 1898.

PLAINTIFFS sue to recover insurance upon the life of one Joseph Seiler, deceased. Two actions were brought, each upon a different policy. The actions were consolidated in the trial court. Defendant made one answer to the two claims, as combined. There was a trial to a jury, verdict and judgment for plaintiffs, and defendant appeals.—*Affirmed.*

*Hayes & Schuyler* for appellant.

*Calvin H. George* for appellees.

WATERMAN, J.—The undisputed facts in the case are that the defendant company issued to one Joseph Seiler the two policies in suit, numbered, respectively, 17,146 and 17,147. By these policies the life of said Seiler was insured for the benefit of the plaintiffs in the

sum of two thousand dollars; each policy being for the sum of one thousand dollars.    Both of these policies were issued upon a single application.    This application was signed, "Joseph Seiler"; and a copy thereof, with the exception that the signature was omitted, and in its place appeared the word "Signed," was attached to policy No. 17,146.    No copy or purported copy of the application was attached to policy No. 17,147, but there was an indorsement thereon in these words: "For copy of application, see policy No. 17,146, issued to same party."    The policies were taken out on the thirty-first day of August, 1895; and, on the seventh day of October following, Seiler committed suicide.    The policies contained no provision in relation to suicide, but there was this clause in the application, "I also warrant and agree that I will not die by my own act, whether sane or insane, during the period of three years following the date of the issue of the policy for which application is hereby made."

II.    Defendant, in its answer, sets up, in one paragraph, that Seiler, while in a sound mental condition, took his own life.    This was demurred to by plaintiffs, and the demurrer sustained, to which defendant excepted.    No question is made as to the propriety of thus attacking by demurrer a paragraph in a pleading. It was alleged by defendant in another paragraph of its answer that Seiler, with the intent to defraud defendant company, procured it to issue said policies; he at the time intending to take his own life, as in fact he shortly thereafter did.    This matter was also assailed by a demurrer, which was overruled.    Evidence was introduced upon this branch of the case, and this single issue of fact was submitted to the jury.

III.    The appellant assigns fifty-nine errors.    We think the matters can be condensed under five heads: (1) Was the application a part of policy No. 17,147, to

which neither a copy or a purported copy was attached?
(2) Was it a part of policy No. 17,146, to which was attached a copy that omitted the signature of the applicant? (3) Will the suicide of the assured operate to avoid, as against a beneficiary named therein, a policy which does not in terms except death in that manner from the risk assumed? (4) Did the trial court err in its instructions? (5) Had the appellant the right to open and close before the jury?

IV. Taking up the questions in the order of stating them, we shall devote no time to the first, for it will be disposed of by what we have to say under the next head.

V. Attached to policy No. 17,146 was a copy of the application made by the assured, except, as already said, that the signature of the applicant was omitted, and in the space where his name appeared in the original was the word "Signed." The trial court refused to permit the introduction in evidence of this application, when offered by defendant as part of the contract. This ruling, we take it, was based on the provisions of section 2, chapter 211, Acts Eighteenth General Assembly, the material portions of which we set out: "All insurance companies or associations shall, upon the issue or renewal of any policy, attach to such policy, or endorse thereon, a true copy of any application or representations of the assured, which, by the terms of such policy, are made a part thereof, or of the contract of insurance, or referred to therein, or which may in any manner affect the validity of such policy. The omission so to do shall not render the policy invalid, but if any company or association neglects to comply with the requirements of this section, it shall forever be precluded from pleading, alleging, or proving such application or representations, or any part thereof, or falsity thereof, or any parts

thereof, in any action upon such policy.    *    *    *"
This section has been often construed.    For a quite
recent exposition of its meaning we refer to *Goodwin v.
Society*, 97 Iowa, 226. It is argued on behalf of the
appellant that all of the statements and representa-
tions made by the assured were in the copy that was
attached to the policy, and that he could not have been
prejudiced by the omission of his signature, for he must
have known that he signed the original. But it seems
to us that the very purpose of the statute was to avoid,
so far as possible, any dispute as to the assured's knowl-
edge of the contract. The requirement is that a copy
of the application shall be attached. We do not under-
stand this to call for a *fac simile*, but it certainly
demands at least a substantial reproduction of the
instrument. The signature is an essential part of the
application, and all that is essential in the original
should appear in the copy. It will be noted that in the
alleged copy it is not stated by whom the original is
signed. In Wisconsin they have a statute which is the
counterpart of the one under consideration, and in *Dun-
bar v. Insurance Co.*, 72 Wis. 492 (40 N. W. Rep. 386), it
was held that a copy of the signature of the applicant
was essential, in order to make a copy of the applica-
tion, within the meaning of the law. The case was, in
its facts, like the case at bar, except that the blank for
the signature in the copy contained nothing to indicate
that any signature was appended. The court, in speak-
ing on the subject, says:    "We are of the opinion that
the copy of the application attached to the policy, not
having the copy of the name of the applicant appended
thereto, cannot be said to be a copy of such application,
within the meaning of the statute. The signature is
the thing which gives force to the application, and,
when signed with knowledge of its contents, is con-
clusive on the insured.    *    *    *    We think that the

signature of the party to an instrument which receives its vitality solely from such signature is such a substantial part of it that a copy of it must contain such signature." As having some bearing, we also cite *Kyser v. Railway Co.*, 56 Iowa, 207. The trial court was right in holding that the application in this case was no part of the contract, and that the statements therein could no be given in evidence.

VI. The defense of suicide was set up in two forms. In one, as we have said, it went to the jury. The paragraph of the answer to which the demurrer was sustained was as follows: "That the said Joseph Seiler on or about the 7th day of October, 1895, and while in same mental condition, and able to understand the moral character and consequences of his act, committed suicide, and intentionally and purposely killed himself, by shooting." The question thus presented by the ruling on the demurrer is: If a policy of insurance on life, containing no stipulation as to suicide, is taken out in good faith by the assured, will it be avoided, as against a beneficiary named therein, by the fact that the assured thereafter, while sane, deliberately and purposely took his own life? The authorities are not many on the subject, and they are not seriously in conflict. While there are a number of cases in which something has been said upon this matter in the way of *dicta*, there is but one in which it has been expressly decided that the suicide of the assured, if sane, will avoid a policy that contains no provision of forfeiture in such case, and that is *Ritter v. Insurance Co.*, 18 Sup. Ct. Rep. 300, decided at the October term, last, of the federal supreme court. The opinion in this case in the circuit court of appeals appears in 17 C. C. A. 537, and 70 Fed. Rep. 954. This last citation is given because we shall have occasion to refer to this opinion in the course of what we shall say. It was held in the

*Ritter Case* that there could be no recovery on a policy
of insurance by the executor of one who, while sane,
intentionally took his own life, even though the policy
contained no clause of forfeiture because of such act.
We think that case is readily distinguishable from the
case at bar.    In the *Ritter Case* the action was brought
by the personal representative of the assured, whose
claim had to be made through the wrongdoer, while
here the suit is instituted by beneficiaries named in the
policy, and who claim in their own right.    An investi-
gation will diclose that the distinction we make is
material, and supported by authority.    In *Moore v.
Woolsey*, 4 El. & Bl. 243, the policy contained a stipu-
lation avoiding it, as far as regarded the executors and
administrators of the assured, if he died by his own
hand, but leaving it in force to the extent of any inter-
est acquired by a third person.    The plea was that the
assured had committed suicide.    Replication that one
Kettle, before the death of the assured, had acquired
by assignment an interest in the policy.    Upon these
issues, Lord Campbell, delivering the opinion, said: "If
a man insures his life for a year, and commits suicide
within the year, his executors cannot recover upon the
policy, as the owner of a ship, who insures her for a
year, cannot recover upon the policy if within the year
he cause her to be sunk. A stipulation that in either case
upon such an event the policy would give a right of
action would be void."    This is the language quoted in
the *Ritter Case*, and it was *obiter* only.    But Lord
Campbell said something more, and something not only
pertinent to the issues before him, but that has direct
application to the matter we are considering.    He con-
tinues: "But, where a man insures his own life, we
can discover no illegality in a stipulation that if the
policy should afterwards be assigned, *bona fide*, for a

valuable consideration, or a lien upon it should after-
wards be acquired, *bona fide*, for a valuable considera-
tion, it might be enforced for the benefit of others,
whatever may be the means of his death.   *   *   *
The supposed inducement to commit suicide under such
circumstances cannot vitiate the condition, more than
the inducement which the lessor may be supposed to
have to commit murder should render invalid a benefi-
cial lease granted for lives.   When we are called upon
to nullify a contract on the ground of public policy, we
must take care that we do not lay down a rule which
may interfere with the innocent and useful transactions
of mankind." If public policy does not stand in the
way of a recovery by an assignee, we can discern no
reason why it should in the case of a beneficiary named
in the contract.   It may be said that the assignee
spoken of is one whose claim rests upon a consideration
paid.   To this we would say that the claim of the bene-
ficiary is also based upon a consideration paid by the
assured.   If it should further be said that public policy
does not bar a recovery by the assignee because the
interests of creditors furnish little or no motive for the
self-destruction of the assured, our answer would be
this:   The motives for suicide are manifold and varied.
An inquiry as to what inducement is most likely to
impel one to the act is profitless, for any rule of law that
would prevent a recovery by these plaintiffs would oper-
ate in like manner against a mere creditor, if he were
the beneficiary named.   And, further, we might call
attention to the *Ritter Case*, in which the assured
admittedly sacrificed his life for the benefit of his credi-
tors.   In the opinion in the *Ritter Case* in the circuit
court of appeals it is said: "In the cases brought to
our attention where suicide during sanity, by the per-
son whose life was insured, was held not to be a valid
defense, the policy was issued for the benefit of some

other person, or an independent interest, by assignment
or otherwise, had been acquired by a third person."
Here is the distinction plainly made. So, also, in the
opinion of Mr. Justice Harlan on appeal, we think the
same idea is expressed. In commenting on an expres-
sion used in another case, he says:   "This observation
was irrelevant to the case before the court, and cannot
be regarded as determining the point in judgment.  If
it was meant there could be a recovery by the personal
representative,   *   *   *   we cannot concur in that
view." Another and a convincing reason for thinking
that the doctrine announced in the *Ritter Case* was not
intended to go further than to deny a right of recovery
to the personal representatives of the assured is that no
one of the several cases in which beneficiaries named
in the contract have been held entitled to recover
was mentioned in that opinion.   We shall now refer to
these cases:   *Fitch v. Insurance Co.*, 59 N. Y. 559, is
the first.  Suit was brought by the widow, to whom the
policy was payable.   The contract contained no clause
avoiding it in case of suicide by the assured.   One
defense tendered was that the assured took his own life.
Evidence to sustain it was excluded by the trial court.
In affirming this ruling the court of appeals says: "The
policy contained no stipulation that it should be void
in case of the death of the insured by suicide.   It was
not taken out for the benefit of Fitch, but of his wife
and children.   Although they were bound by his repre-
sentations, and any fraud he may have committed in
taking out the policy, the policy having been obtained
through his agency, yet they were not bound by any
acts or declarations done or made by him after the issue
of the policy, unless such acts were in violation of some
condition of the policy."   *In Darrow v. Society*, 116
N. Y. 537, (22 N. E. Rep. 1093), the plaintiff was the
beneficiary under the contract.   The assured com-
mitted suicide. · There was a provision in the policy

that it should "be void if the member herein shall die in consequence of a duel, or by the hands of justice, or in violation of, or an attempt to violate, any criminal law of the United States, or of any state or country in which the member may be." Held that, suicide not being a crime in New York, the condition of the policy was not violated, and the plaintiff could recover. *Kerr v. Association*, 39 Minn. 174 (39 N. W. Rep. 312), is a case similar in principle to the last. The same holding in favor of a beneficiary has been made by this court in *Goodwin v. Society, supra*. The policy sued upon there provided for its forfeiture in the event of suicide within two years, and by its express terms it was incontestable after that time. After the lapse of that period the assured took his own life. The policy was issued to the wife. In an action by her, we held she could recover. Now, if suicide is a risk that the company is forbidden, by considerations of public policy, to take, it could not have been held as within the agreement not to contest; for, if a contract to insure as against the risk of suicide is void, the waiver here must have been invalid, and the defense should have been sustained. The question was brought directly to the attention of the court in argument, as appears from the language of the opinion. These are the cases which we have been able to find. We wish now to add a few words on principle, by way of emphasis of a thought already expressed. It is not the wrongdoer who makes claim here, nor any representative whose rights are to be measured by those of the wrongdoer, but persons who acquired an interest at the time the policy was taken out, and who are not in any way responsible for the loss under it. The defendant might well have guarded against this contingency in its contract. Not having done so, we think it is now in no position to complain.

VII. Error is assigned on the refusal of the trial court to give instructions asked by defendant. Fifteen

instructions were asked. We need not set them out. We find that the charge, as given, fully covered the case.

VIII. Instruction No. 7 of the court's charge is complained of. In this paragraph the jury was told that fraud was not to be presumed, but, like any other fact, might be proved by circumstances "from which the inference of fraud is natural and irresistible." It is the use of the word "irresistible" to which objection is made. The word is certainly not well chosen, but it is qualified to such an extent by the instruction next following that its employment could not have prejudiced defendant. We might very well put our rulings on the instructions on another ground. We have carefully read the testimony offered by defendant to establish the fact that, at the time he took out these policies, Seiler intended to commit suicide, and thus defraud defendant; and we find nothing in it to support any such claim. The trial court might with propriety have taken the case from the jury.

IX. What has just been said disposes of defendant's contention that it was entitled to open and close. If error was committed by the trial judge in this matter,—which we by no means hold,—it was wholly without prejudice. The judgment below will be AFFIRMED.