BERTHA E. RICHARDSON, Appellee, v. IOWA STATE TRAVELING MEN'S ASSOCIATION, Appellant.

No. 45119.

320

APRIL 2, 1940.

REHEARING DENIED JUNE 20, 1940.

Mills, Hewitt & Diltz and Carr, Cox, Evans & Riley, for appellant.

Stipp, Perry, Bannister & Starzinger and Alexander H. Sands, for appellee.

MITCHELL, J.—Charles Lewis Richardson for many years prior to his death had been employed by the Commission of Conciliation, United States Department of Labor, and his duties were to proceed to wherever he was ordered to go to mediate and settle disputes between employers and employees.

Late in the afternoon of Saturday, February 5, 1938, he being then in the city of Washington, D. C., Richardson received orders from his superior officers, to proceed forthwith to

Langley Aviation Field, Virginia, where under sealed orders he was directed to take a United States Army airplane then in waiting, with Major William C. Goldsborough of the United States Army as pilot to the airport at Miami, Florida, then to take an airplane to Porto Rico and act as mediator in a longshoremen's strike there pending.

In obedience to said orders Richardson immediately proceeded to Langley Field. There he met Major Goldsborough, who had been ordered by the War Department to fly Richardson to Miami.

The plane to be used was an army airplane and was known as an attack or combat plane. It was not a plane for which a certificate had been issued to carry pay passengers and was not operated on a regular schedule between two or more airports. Army planes are operated wholly independent of civil aeronautic regulations.

The story of the flight and of the death of Richardson is not in dispute. It is told by Major Goldsborough, the pilot of the ship.

In the plane used, the pilot sat forward and the passenger behind. The cockpits were closed by sliding glass hatches, which could be either opened or closed. It had a top speed of about 200 miles per hour; was equipped with an interphone communication by which the pilot and passenger could converse with each other; and was also equipped with a radio.

When Richardson reached the airport he met Major Goldsborough, who asked him if he had flown before, the Major did not remember how Richardson answered this question. The Major then asked him if he was familiar with parachutes and Richardson said "No." He then instructed him in the use of the parachute, gave him a brief description of how it was made, and the procedure in case it was necessary to make an emergency jump.

At about the hour of 10 o'clock on the night of February 5, 1938, with Major Goldsborough piloting the army plane, Richardson left Langley Field.

The plane climbed to an altitude of 3,500 feet and the pilot discovered he was flying in clouds, encountered some rain, and the air was extremely rough. He immediately started climbing in order to reach smoother air, and to get on top of the clouds reaching an altitude of 9,000 feet. It was very cold at this altitude and the heater in the plane was not working properly, so the pilot descended to an altitude of 1,000 feet, hoping to get below the clouds. The pilot tuned in on several weather stations to get the forecast and he received information that conditions were better at Miami and Jacksonville and he changed his course slightly in order to contact the Charleston radio beam.

The radio beam is used in the operation of an airplane to form a pathway or route. If you go to one side of the beam you will receive a signal "N" on the radio in the airplane. If you go to the other side you will receive the letter "A." When you are directly on the course, you receive a continuous hum on the radio, and every one or two minutes, you receive the station signal. Thus in case of bad flying weather you would have a true course flying the beam.

Shortly before they reached Charleston the radio reports showed that the weather was very unfavorable for flying but that it was clear at Miami. The ceiling other places was very low. By the use of the word "ceiling" in aviation is meant the height from the ground that an overcast or clouds might be contacted, or where a horizontal visibility is lost.

They passed Charleston and shortly thereafter the cockpit lights fluttered and the radio became very "buzzy and dim." About 30 minutes later the radio became very weak, and then cut out entirely, also the interphone ceased to function.

The Major testified that he did not worry because he was on a direct course to Jacksonville and he had been advised by the weatherman that there was a ceiling of 1,500 feet there.

When he decided he was in the vicinity of Jacksonville he descended to a height of about 500 feet, and then to 300 feet in the hope that he might be able to contact the ground. He found no ceiling whatsoever and decided to continue south in

the hope that he might run out of the fog. He continued south until he noticed his gasoline was running low, and not knowing whether he had drifted out to sea, he turned the plane back to where he knew land was. The pilot then climbed to an altitude of 2,000 feet, and cut down on the speed of his motor in order to save gas, in the hope that he could keep the plane in the air until daybreak, hoping that with the coming of the dawn the fog would clear. He advised Richardson of the situation by writing him a note. The plane stayed in the air until after daybreak and the pilot descended to an altitude of 500 feet, on five or six occasions, but at no time was there sufficient ceiling or a horizontal visibility near the ground to make any attempt to land without the prospect of a dangerous crash.

There was little gasoline left and the pilot climbed to an altitude of 3,500 feet, where he cruised about until the fuel was consumed. He wrote a note to Richardson explaining the situation and telling him it had become necessary for both of them to leave the airplane and use their parachutes. The Major asked Richardson if he remembered how to use the parachute and he nodded his head. The pilot wrote him a note and told him to get in position to jump but not to leave the ship until he told him to. Richardson opened the hatch and got out on the side of the cockpit. The pilot leveled the ship, and Richardson left the plane. He cleared the airplane and the pilot watched him until he reached an altitude of 2,000 feet. The parachute did not open, whether Richardson failed to pull the release or the parachute failed to work is not and will not ever be known. Richardson was killed in the fall. Shortly after Richardson left the ship, Major Goldsborough jumped out, but through the use of his parachute landed safely. The airplane crashed to the ground and was a complete wreck.

At the time Richardson met his death he was a member in good standing of the Iowa State Traveling Men's Association, holding two certificates of membership therein. The beneficiary named in the certificates commenced this action to recover from the insurance company the amounts specified in the certificates. A jury was waived and the cause submitted to the court, which

entered judgment in favor of the plaintiff, the beneficiary, in the amount prayed. The insurance company has appealed.

We are confronted with many interesting questions, but there are few decisions to guide us as the airplane is a new means of transportation and few are the cases that have as yet reached the courts.

It was the contention of the appellant that it was not liable because by the terms of the certificate the bylaws providing therefor constituted a part of the contract.

The parts of the bylaws pertinent to the question to be presented upon this appeal are as follows:

## "Article VII
### "Benefits.

"Section 1. Subject to the conditions, limitations and exceptions contained herein, * * * whenever a member in good standing is the holder of Class A or Class B certificate or certificates of membership therein and shall through external violent and accidental means, receive bodily injuries which shall, independently and exclusively of all other causes result, within ninety (90) days, in the death of the member, his beneficiary shall * * * be indemnified in the sum of Five Thousand Dollars ($5,000.00) per membership, provided member's age at the time of his death is under seventy (70) years.

"CONDITIONS, LIMITATIONS AND EXCEPTIONS.

"G. The association shall not be liable for death, disability or specific loss, * * * or for injuries received in, on or caused by any aerial conveyance, except while the insured is a passenger in or on or while entering or leaving a passenger aeroplane or dirigible airship having a United States Government license, operated by a pilot licensed by the United States Government to carry pay passengers and operated on a regular schedule between two or more airports."

The appellee does not deny that the bylaws are a part of the certificate of insurance but claims that appellants waived the provision of paragraph G, section 1 of the articles of by-

laws. To this the insurance company replies. We quote from appellant's brief:

"It is apparent from a casual reading of the two provisions of the By-Laws, to-wit, Section 1 of Article VII and Paragraph G of the 'Conditions, Limitations and Exceptions', that the latter clause is not a forfeiture provision. It does not provide that the insurance shall be forfeited in case the member shall take a ride in or on an airplane or other aerial conveyance, except as a passenger upon the kind of a conveyance designated in the qualification of the exception. There is no prohibition in Paragraph G against the member riding in any kind of an aerial conveyance he desires. There is no penalty or forfeiture of his rights as a member in case he does so. The provision is merely that the insurance benefits in the event of an injury related to such aerial conveyance shall be suspended. On the other hand, the contract is in force with respect to all other hazards assumed by the contract of membership. For injuries sustained, otherwise than as a result of causes excepted, the liability remains, even though the member may many times have participated in balloon ascensions, parachute jumps, or airplane races. For injuries, fatal or non-fatal, sustained as a result of causes unrelated to the excepted hazard, the member is still entitled to the benefits of the contract; notwithstanding the fact that he may on another occasion expose himself to hazards not assumed by the contract."

So we are confronted here with the question whether this was a forfeiture clause, or merely a limitation of risk.

This court in the case of Melton v. Royal Highlanders, 194 Iowa 352, 358, 189 N. W. 787, 790, said:

"This classification applied to all members of the society who may even occasionally do such work. The penalty is that their insurance shall not be deemed to cover risks arising out of such occupation or work. This is not a forfeiture provision. It is a restricted insurance. The defendant is a mutual assessment company, and its rates of assessment are predicated upon

the reduced hazard of this restriction. Presumptively, the insured never paid an assessment as indemnity for any risk growing out of such occupation. The injury which resulted in the death of the insured did grow out of the occupation of a fireman. The insured received his fatal injury while attempting to board a fire truck which was proceeding to a fire.

"The net result of our analysis of the contract is: Though a member in good standing, the deceased was not insured against injuries growing out of the occupation of fireman."

In the case of Pierce v. Homesteaders, 223 Iowa 211, 217, 272 N. W. 543, 546, this court said:

"It has been repeatedly held that while a forfeiture of benefits contracted for may be waived, the doctrine of waiver or estoppel cannot be successfully invoked to create a liability for benefits not contracted for at all." Citing McCoy v. Association, 92 Wis. 577, 66 N. W. 697, 699, 47 L. R. A. 681.

In the McCoy case, cited by our court, there was involved an exception of the risk of death due to suicide. The court of Wisconsin said:

" * * * but we are unable to see how the settled rules under which it is held that a forfeiture or condition of forfeiture may be waived applies here. What is insisted upon is not really the waiver of a forfeiture, or an equitable estoppel against insisting upon a condition of the policy, the violation of which would otherwise work a forfeiture. It is a misuse of the term to so speak of the loss of benefits under the certificate in question. What is here sought is not to prevent a forfeiture, but to make a new contract; to radically change the terms of the certificate so as to cover death by suicide, when by its terms that is expressly excluded from the contract. * * * After a loss accrues, an insurance company may, by its conduct, waive a forfeiture; or by some act before such loss it may induce the insured to do or not to do some act contrary to the stipulations of the policy, and thereby be estopped from setting up such violation as a forfeiture; but such conduct, though in conflict with the terms

of the contract of insurance and with the knowledge of the insured, and relied upon by him, will not have the effect to broaden out such contract so as to cover additional objects of insurance or causes of loss.''

In Ruddock v. Detroit Life Ins. Co., 209 Mich. 638, 177 N. W. 242, 243, there was involved a policy providing:

'' 'It is unrestricted as to travel, residence, or occupation and shall be incontestable after one year from date, except for non-payment of premium and except for naval or military service in time of war, without a permit, which are risks not assumed by the company * * * ' ''

The policyholder was inducted into the service and died at Camp Custer. Notice of his death was given to the company, which sent proofs of loss and suggested the appointment of an administrator, inasmuch as the benefits were payable to the insured's estate. Proof of claim was furnished and acknowledged, after which liability was denied on account of the above provisions. Its effect was sought to be avoided by the plea of waiver based upon the requirement of proof of loss, the suggestion with respect to the appointment of an administrator, and the expense incurred in so doing. The court denied the waiver, saying:

''The cases where the doctrine of waiver, or estoppel, has been applied have largely been cases where the insurance companies have relied on a forfeiture of the contract, upon breaches of the warranties and conditions to work such forfeitures; and in many such cases this court and other courts of last resort have held that if the companies have led the other party, to his prejudice, to his expense, to understand that such forfeitures, such breaches of warranties and conditions, would not be insisted upon, then the companies would be estopped from asserting such defenses. But here the defendant makes no claim of forfeiture of the contract; on the contrary, it is insisting upon the contract itself, and insisting that by its terms it did not insure the deceased when engaged in military services in time

of war. To apply the doctrine of estoppel and waiver here would make this contract of insurance cover a loss it never covered by its terms, to create a liability not created by the contract and never assumed by the defendant under the terms of the policy. In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract the parties did make.''

And so in the case at bar, the doctrine of waiver, if it was applied would in reality write a new contract of insurance covering a condition not included in the policy written. It would have the effect of not merely preventing the forfeiture of the contract, but would impose upon the insurer liability, on account of an accident occurring under circumstances, and as a result of hazards not assumed by the contract. The appellee seeks in this case to create by waiver a contractual liability not contained in the policy itself. That doctrine cannot be made to serve that purpose.

██ ██ It is next contended by the appellee that the death did not result ''in or caused by any aerial conveyance.'' That the airplane was in good mechanical condition; that Richardson did not have to jump; that he might have remained in the airplane; that he left the airplane voluntarily.

Clearly under the terms of the policy the appellant did not assume the risk of air travel except those risks incident to travel as a passenger on a plane licensed to carry pay passengers and operating regularly between two or more airports. There can be no question but that the army plane in which Richardson was traveling does not come within the exceptions contained in the policy.

The airplane in which Richardson was riding was 3,500 feet in the air, in a fog so dense that the pilot would not attempt to land. The gasoline had been exhausted. The motor could not be operated without fuel. The pilot ordered Richardson to jump. It was the airplane that placed this unfortunate individual 3,500 feet in the air. It was the failure of the air-

plane to operate, caused by running out of fuel that forced Richardson to jump. The accident happened while he was in the airplane, and the fact he attempted to save his life by jumping from the plane in the hope that the operation of the parachute would minimize the consequence of the airplane failure is immaterial. The accident which created the hazard was the combination of weather conditions and the lack of fuel. When they combined, all the forces which culminated in Richardson's death were in motion, and the only question remaining was whether or not the logical sequences could be interrupted.

As we read this record, Richardson had no choice but to leave the plane and hope and pray that the parachute would land him safely. The plane could no longer be operated. It was impossible to land. From 3,500 feet in the air the plane was bound to fall to the earth, just as it did, and be completely destroyed.

In oral argument counsel for appellee was asked by a member of the court if he would consider that Richardson left the plane voluntarily if the plane had caught on fire. As the writer of this opinion remembers it, the question was not answered. Certainly under the circumstances in this case, Richardson was forced to leave the plane, just as much as if the plane was afire.

Appellant cites the following examples. We quote:

"We apprehend that no one would contend that a person who drowned after abandoning a wrecked boat and attempted to swim to shore did not die as a result of the ship wreck. Would it be contended that any person who got into a life boat after the wreck of the Lusitania or the Titanic, which never reached safety, was not killed as a result of the disaster to the ship? Would it be said that a person abandoning a ship wreck in mid-ocean left it in safety merely because he was alive and clung to a spar or life-preserver, or was in a life-saving boat, in the hope that he might be rescued?"

In Federal Life Ins. Co. v. White, Tex. Civ. App., 23 S. W. 2d 832, 833, there was involved a clause in an accident insurance policy which provided for the payment of a specific sum for

death "sustained by the wrecking or disablement of any vehicle or car operated by any private carrier or private person in which the insured is riding or by being accidentally thrown therefrom."

The assured left Hanna, Wyoming, for the purpose of driving to Medicine Bow, a distance of about 30 miles. The temperature was 10 or 15 degrees below zero. After traveling about 15 miles the car became disabled to such an extent that it could not be operated or driven further. White abandoned the car and started to walk. After struggling on about 2 miles he was overcome by exposure to the cold, lost consciousness, and died as a result of the freezing.

It was admitted that the death was sustained as a result of accidental means as the policy provided, but it was denied that the disablement of the car caused the death. The court said:

"The language of the policy does not require, as a prerequisite to liability, that insured's death shall be sustained immediately by the disablement of his car, but requires only that it be sustained by the disablement of his car."

By virtue of the other terms of the policy, the court construed the words "sustained by" as the equivalent of "caused by" or "resulting from," and then said:

"But appellant contends he received no injury by reason of the disablement of the car, but we think it reasonable, and the trial court was authorized to find, that immediately on leaving the disabled car he suffered injury in becoming cold, and in his efforts to find shelter he walked on, getting colder and colder, until he lost consciousness and sank down in a snowdrift, where he was found the next day practically frozen to death. We think the agreed statement, in effect, shows the disablement of the car was the proximate cause of the deceased's death. His death was sustained immediately by freezing, but the disablement of the car caused him a long-continued exposure to the cold, and this long-continued exposure to the cold caused him to freeze to death. Clearly, we think, the disable-

ment of the car was the sole proximate cause of the assured's death.''

In Wright v. Aetna Life Ins. Co., 3 Cir., 10 F. 2d 281, 282, 46 A. L. R. 225, there was involved a clause in an accident policy providing for an additional payment as indemnity against ''bodily injuries effected solely through external, violent, and accidental means, while he is riding in, operating, or caring for a private automobile.'' Assured was riding in an automobile of a friend, who was driving. They were driving down a mountain road and the driver, in attempting to change gear, temporarily at least, lost control of the car. On regaining control he found the deceased had disappeared, and, going back, found him lying face down on the road. He died without regaining consciousness. The question was, ''Did the policy cover such an accident?''

''That the physical injury suffered by the deceased was inflicted when he struck the road, and not when he was in the car, is clear, and therefore, adhering to the literalism of its policy the company contends the deceased, when injured, was not 'riding in the car', and therefore, looking at the injury and accident as occurring at the instant his head struck the roadway the situation was one not covered by the policy. On the other hand, it is contended that the real accident was losing control of the car, and if the deceased was then riding in the car, and one of the natural and to be expected results of that lost control was that he might leave the car, then the policy covered the situation.''

The court also said:

''In the present case the real accident was not when Wright's head struck the road, but when car control was lost. Such lost car control was the critical accident time, and the dominating factor which subjected the riding passenger to present peril and later death.

''That constraining, existing accident might result in different, and to be expected, consequences; but in any event, the accident of lost car control was the proximate cause of the

rider's death, whether the swerving of the car threw him out physically, or the nervous strain caused him to leap in fright, hysteria, or in answer to the instinct of self-preservation. What followed was an injury more or less commonly incident to such lost car control. We cannot bring ourselves to the belief that the parties to this policy meant that this usual result of loss of car control was not to be covered by this policy, for, if it was, no one would care to pay a premium for automobile protection. To us it is more reasonable to believe that, assuming the insured desired protection 'while riding in' a car, and a fair-minded insurance company meant to sell and give him such protection, that the common contracting purpose of the two would be that the insured was to be protected from the time he started riding at a journey's beginning and continued until he ceased riding at its end, and that the words 'while riding in' the car referred to the intervening riding time, and if, during such time, injury was suffered from an accident which might reasonably be expected to happen to one so 'riding in' a car, that the words 'while riding in' were meant to cover and did cover a situation such as we now have.''

In the above-cited case the federal court says that ''the real accident was not when Wright's head struck the road, but when car control was lost,'' so in the case at bar, the real accident happened when the airplane ran out of fuel, and in a dense fog could no longer be operated. At that moment it became necessary for Richardson to leave the plane. He was .forced out of the plane by the condition it was in, and unfortunately, the parachute, which he had hoped and no doubt prayed would save his life, did not function as it was supposed to do, and he fell directly from the airplane to the ground. There was a motion to dismiss submitted with the case. It has been duly considered and is hereby overruled.

It necessarily follows that the case must be and it is reversed.—Reversed.

HAMILTON, C. J., and HALE, STIGER, BLISS, MILLER, and SAGER, JJ., concur.