MILDRED C. ONSTAD (FORMERLY PROEBSTLE) v. MINNE-SOTA MUTUAL LIFE INSURANCE COMPANY.[1]

July 30, 1948.

No. 34,599.

[1]Reported in 33 N. W. (2d) 691.

*Doherty, Rumble, Butler & Mitchell,* for appellant.

*Bundlie, Kelley, Finley & Maun* and *Mandt Torrison,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action by the beneficiary under two life insurance policies, each in the amount of $5,000, issued by defendant August 18, 1943, on the life of Roy Proebstle, a commercial airplane pilot, who met death while acting as pilot on a flight in Alaska on September 18, 1944. Defendant admitted liability only for the amount actually paid in premiums, plus any unpaid dividends thereon, and claimed exemption from additional liability by virtue of an "Aviation Rider" attached to the policy which provided:

"AVIATION RIDER

"Attached to and Made a Part of Policy No. [policy number]
"Insuring Roy Proebstle

"This policy provides full coverage against death of the Insured as a result of riding as a fare-paying passenger of a commercial airline flying on a regularly scheduled route between definitely established airports; but otherwise, coverage in event of death of the Insured as a result of travel or flight in or on any species of aircraft, or of participation as a passenger or otherwise in any aviation or aeronautic operation, shall be limited to the amount paid hereon in premiums * * *. Any dividends standing to the credit of the policy and the reserve on any dividend additions shall be added to the amount payable * * *.

* * * * *

"IN WITNESS WHEREOF, The Minnesota Mutual Life Insurance Company has caused this Rider to be executed August 18th, 1943.

"Carl R. Anderson
Secretary
"C. A. Hamm
Registrar
"* * * * * * * [Illegible]
President."

Prior to the issuance of the policies, defendant had submitted to the commissioner of insurance, and the latter had approved, a form of aviation rider, the restrictive provisions of which were identical with those of the rider attached to the policy above described, ex-

cept that the phrase "Attached to and Made a Part of Policy * * *," instead of being set forth at the top of the rider was placed in the attestation clause at the bottom thereof, followed by printed signatures of the secretary and president and the following statements:

"I certify that I read this Rider to the Insured and explained its effect to him. I saw him sign the original rider in the policy.

"Agent"

"This Rider has been read to me and its effect explained to me. I countersigned the original rider in the policy.

"Insured."

A third aviation rider form, the restrictive provisions of which were likewise identical with those of the rider attached to the policy and the rider submitted to and approved by the commissioner of insurance, with the exceptions hereinafter noted, was executed by the insured and retained by the company in its files. The features which distinguished it from the first and second riders above described were the clauses above the signatures of the agent and insured. These were as follows:

"Signature on behalf of the Company
    "[Signed] K. B. Victor
        "General Agent"

"This rider has been read to me and its effect explained to me.
        "Roy Proebstle
            "Insured."

This form had been submitted to the commissioner of insurance, who had filed the same without expressly approving or disapproving it. In none of the forms described was there any variation in the restrictive provisions, the only differences being in the clauses relating to the reading and countersigning of the original rider, as above outlined. It is not disputed that the premium on each policy would have been approximately an additional $75 per annum if the aviation riders had been eliminated.

Insured had been employed as an aircraft pilot by Northwest Airlines, Inc., since 1942. For some time prior to September 18, 1944, he had been engaged in piloting United States Air Transport Command planes for Northwest Airlines in the so-called Northern

or Alaskan Region under a contract between his employer and the United States government.

On September 7, 1944, he left Minneapolis by plane for a tour of duty in the Northern Region. On September 18, 1944, with 19 military service passengers and cargo, he left Anchorage, Alaska, for Edmonton, Alberta, Canada, via Fairbanks. The plane never arrived at Fairbanks. On September 21, 1944, his wife, the plaintiff here, was informed that the wreckage of his plane had been discovered in the mountains near Mount McKinley. The adjutant general's office of the United States subsequently issued a certificate stating:

"The records of this office show that Roy Proebstle, civilian, died September 18, 1944, near Mount McKinley, Alaska, pilot in a military airplane accident while on an authorized flight."

The plane was equipped with first-aid kits and an emergency survival kit containing concentrated foods and miscellaneous articles to assist survivors. It also contained a portable radio with hand crank which could be utilized to call for aid in the event of a crash, but it carried no parachutes.

Subsequent investigations indicated that the point of original impact of the plane crash was at an elevation of about 11,400 feet on a diagonal against a nearly vertical ice-covered glacier. One wing had cut a patch of considerable depth in the ice. An engine was embedded in the ice at least a foot. The main part of the wreckage was about 1,700 feet below and was scattered about a quarter of a mile in all directions, while some objects were half a mile still farther down the glacier. No sign of insured or other occupants was visible to investigators by plane, who flew within 50 feet of the wreckage.

Bradford Washburn, a mountain climber of long experience, led an expedition on foot to the scene of the crash approximately six weeks after the accident. He described the terrain as so rough that it was impossible to approach the plane from below. The expedition climbed to the peak upon which the aircraft had crashed from the opposite side thereof, and then descended therefrom to the scene of the accident.

Their examination of the wreckage disclosed that the aircraft had sheared off its left wing upon impact; that the vertical stabilizer and tail were missing; that the nose was reduced to a complete state of destruction; that the front section was terribly damaged; that both halves of the door had been thrown off; that the seat of the pilot or copilot, with the safety belt still hitched together in front, was found, but was split up the middle of the back and in two separate sections. A large number of playing cards were discovered near the main wreckage, indicating that the occupants of the plane. had been playing cards just before the crash. Travel orders were also strewn about. No evidence of occupancy nor any trace of human activity was found in the area. No one sighted any of the bodies of the occupants; there was no evidence of any habitation in the vicinity; the seat safety belts were unfastened; the survival kit was found untouched and intact in the main wreckage.

After remaining near the wreckage about three days, Washburn and one other climbed up a slope of sheer ice 1,600 feet to the point of initial impact. In making this ascent, a rope was constantly necessary, and for part of the way steps had to be cut in the ice. They were assisted by two of the party who had remained on the crest of the ridge before the initial descent. After searching the scene of impact for about an hour, the two again descended to the main wreckage, and with other members of the party climbed again to the crest, returning the way they had come. Again no trace of the occupants was observed.

Washburn testified that no one, climbing alone, could have descended the mountain on the side where the plane hit and come out alive; that this descent would have been "absolutely impossible without expert companionship of at least one man and the best mountain climbing equipment available."

At the close of the testimony, both sides moved for a directed verdict. Plaintiff's motion, among other grounds, was based upon the contention that the "so-called * * * aviation rider" was "invalid and ineffectual for any purpose; that the provisions therein contained are not a proper subject for a rider to be attached to an

insurance policy * * * because in violation of the statutory authority * * * that the defendant has failed to show that such rider was as approved by the insurance commissioner * * * that the form attached to the policy does not comply with the statutory requirements for a rider containing the language which the alleged rider contains; * * * that * * * the defendant has failed to sustain the burden of proof that the death of the insured resulted from the * * * acts or conditions specified in the alleged rider as limiting the liability of the defendant, * * *." Plaintiff's motion was granted by the court. In granting it, the court stated:

"* * * the only question involved is one of law, * * *. Consequently, here I have reached the conclusion that * * * the so-called aviation rider, was not legally made a part of the contract of insurance * * *."

This appeal is from an order denying defendant's subsequent motion for judgment notwithstanding the verdict or for a new trial. The only issues presented are: (1) Were the aviation riders attached to the policies valid under the laws of Minnesota; and (2) did the insured meet death within the limitations or exclusions set forth therein?

In substance, plaintiff contends that the riders attached to the policies are invalid because (1) they had not been approved by the insurance commissioner; (2) they did not contain a statement to the effect that they had been read and explained to the insured and that he understood the meaning thereof; and (3) they were not countersigned by the insured.

1-2. Aviation riders such as those here involved were first authorized by L. 1943, c. 156, enacted prior to the issuance of the policies in the instant case, but subsequent to the policy described in Onstad v. State Mut. L. Assur. Co. 226 Minn. 60, 32 N. W. (2d) 185 (No. 34,536), filed April 9, 1948. This law provides:

"Policies of life insurance may be issued in this state * * * *which limit the amount to be paid in the event of death occurring as a result of aviation or aeronautics* under circumstances specified in

the policy, except as a result of riding as a fare-paying passenger of a commercial air line operating on a regularly scheduled route between definitely established airports. * * * *Such limitation may be made by a provision in the policy or by a rider made a part thereof provided,* that when said limitation is made, whether by provision in the policy or by a rider, that *the same shall be read to the insured, its effect explained to the insured, and a statement that the same has been read and explained countersigned by the insured."* (Italics supplied.)

It is asserted, however, that notwithstanding L. 1943, c. 156, it was essential that the specific forms attached to the policies here be approved by the insurance commissioner, and that these riders, not having such approval, did not become a valid part of the contract of insurance. M. S. A. 61.36 provides:

"No policy of life insurance shall be issued or delivered in this state, or be issued by a life insurance company organized under the laws of this state, *until the form of the same has been filed with the commissioner; and after he shall have notified any company of his disapproval of any form, it shall be unlawful for the company to issue any policy in the form so disapproved.* The commissioner's action shall be subject to review by any court of competent jurisdiction." (Italics supplied.)

It is to be recalled that here an aviation rider form had been filed by defendant with the insurance commissioner and approved by him on May 11, 1943, prior to the issuance of the policies. The form thus filed and approved was not in conflict with L. 1943, c. 156. The language of the restrictive paragraphs thereof was identical with that of the forms attached to the policies. Under such circumstances, we are of the opinion that defendant had complied with both L. 1943, c. 156, and M. S. A. 61.36.

At no time was defendant notified by the commissioner, or by anyone else, that the form submitted or any part thereof had been disapproved. Insured had signed a written statement to the effect that the rider had been read and its effect explained to him. No-

where does the statute require that this signed statement be attached to the rider or policy or made a part thereof. Nowhere does the statute require insured's countersignature as a part of the policy or any rider attached thereto. We cannot by judicial decree "legislate" such a requirement into the clear language employed in the statutory enactment. Johnson v. Central L. Assur. Society, 187 Minn. 611, 246 N. W. 354, 91 A. L. R. 1058. Under such circumstances, it can scarcely be disputed that defendant fully complied with all statutory requirements in issuing the policies with the aviation riders attached thereto.

3. It is true, there were certain minor variations between the form filed and those attached to the policies. Such variations did not relate to the promissory provisions of the two forms, which were identical. Rather, they involved only the language over insured's signature, and the position of the clause making the rider a part of the policy to which it was to be attached. No statutory directions have been made with reference thereto, and no statutory violations have been indicated in connection therewith.

It has frequently been held that the insurance commissioner need not approve of nonpromissory provisions of a life insurance policy which are mere recitals of fact and do not limit the effect of the contract. In First Trust Co. v. Kansas City L. Ins. Co. (8 Cir.) 79 F. (2d) 48, 50, the court stated:

"That a document affecting a life insurance contract, which document contains both matter coming within this statute and matter not coming within it, admits of a judicial segregation of the good portion from the bad has been determined by the Supreme Court of Minnesota on a construction of the above section of the statute in Coughlin v. Reliance Life Ins. Co., 161 Minn. 446, 453, 201 N. W. 920. * * * Such separation can be properly accomplished in the application before us."

In Heim v. American Alliance Ins. Co. 147 Minn. 283, 288, 180 N. W. 225, 227, this court stated:

"* * * The statute does not prohibit a company from printing in or attaching to the policy terms or conditions not found in the standard form, provided they are not inconsistent with or a waiver of any of the provisions of such form. * * * provisions not conflicting with them may be added when necessary to express the terms of a contract of insurance which is authorized by the statute."

See, also, Hopkins v. Connecticut General L. Ins. Co. 225 N. Y. 76, 121 N. E. 465; Matter of Metropolitan L. Ins. Co. v. Conway, 252 N. Y. 449, 169 N. E. 642; Reddington v. Aetna L. Ins. Co. 264 App. Div. 70, 34 N. Y. S. (2d) 957, affirmed, 290 N. Y. 621, 48 N. E. (2d) 710.

Plaintiff cites Dunbar v. Phenix Ins. Co. 72 Wis. 492, 40 N. W. 386, and Seiler v. Economic Life Assn. 105 Iowa 87, 74 N. W. 941, 43 L. R. A. 537, as upholding a contrary viewpoint. However, they are authority only for the proposition that where by statute a copy of the application for insurance must be attached to the policy before it becomes a part of the conditions of insurance, such copy, when attached, must be actually a true and complete copy of the application. Here, as previously stated, there was no requirement that the rider or policy be countersigned by the insured or that the statement to the effect that he had read and understood the effect of such rider be made a part of or attached to either the rider or the policy. Based upon such authorities, we must hold that the riders attached to the policies were in conformity with the statutory requirements with reference thereto, notwithstanding minor variations therein which did not limit or otherwise relate to the restrictive provisions involved, and hence formed a valid part of the insurance contract.

4. Plaintiff contends that the evidence is insufficient to sustain a finding that insured met death within the limitations and exclusions set forth in the aviation rider. The burden rested upon defendant in this respect. Thompson v. Bankers Mut. Cas. Ins. Co. 128 Minn. 474, 151 N. W. 180, Ann. Cas. 1916A, 277. An impartial examination of the record establishes that defendant has sustained its burden. The testimony was uncontradicted that it would have been

impossible for the occupants of the wrecked plane to survive for any time at all in the extreme temperature and weather conditions which existed at the scene of the crash; that it would have been impossible for anyone except expert mountain climbers to descend the mountain from the scene of the crash; and that even had insured escaped from the plane alive he could not have survived the overwhelming combination of elements and terrain.

Plaintiff cites two cases in support of her position that the burden was not sustained by defendant, namely, King v. Order of U. C. T. (D. C.) 65 F. Supp. 740, and Bull v. Sun L. Assur. Co. (7 Cir.) 141 F. (2d) 456, 155 A. L. R. 1014. The former was reversed on appeal in Order of U. C. T. v. King (4 Cir.) 161 F. (2d) 108, 109. There, the court stated:

"* * * In undertaking an aerial flight over the ocean in a land-based plane, man must reckon with the perils of the sea which are as imminent and real as the unrelenting force of gravity. Just as flight over the land brings forth the danger of violent collision with the earth, we have the dangers of the sea in over-water flight. That men may remain alive for varying periods of time before succumbing does not change the picture. We think it a rather violent fiction to say that death, under such circumstances, comes from accidental drowning. Common knowledge and experience fairly shout of the dangers of shock, exposure and drowning when a flight is taken over water in the winter time in a land based plane."

In the Bull case, the evidence was undisputed that the insured, after being shot down unhurt into the South Pacific, was killed by machine-gun fire from Japanese aircraft before he could launch his rubber lifeboat—clearly an intervening cause of death. There are many cases covering a situation where an insured has drowned after a crash landing in the water and holding such death to be within the exclusion of an aviation rider similar to those involved in the instant case. See, Neel v. Mut. L. Ins. Co. (2 Cir.) 131 F. (2d) 159; Wendorff v. Missouri State L. Ins. Co. 318 Mo. 363, 1 S. W. (2d) 99, 57 A. L. R. 615; Green v. Mut. Benefit L. Ins. Co. (1 Cir.) 144 F. (2d)

55; Richardson v. Iowa State Traveling Men's Assn. 228 Iowa 319, 291 N. W. 408; Barringer v. Prudential Ins. Co. (3 Cir.) 153 F. (2d) 224, affirming 62 F. Supp. 286.

We hold that the evidence submitted would compel a finding as a matter of law that insured met his death in a manner which, under the provisions of the aviation rider, limited beneficiary's recovery under the policies to the amount paid thereon in premiums plus any dividends standing in the name of insured at the time of his death.

Reversed with directions to enter judgment for plaintiff for the lesser amount provided by the policies.

MR. JUSTICE KNUTSON, not having been a member of the court at the time of the argument, took no part in the consideration or decision of this case.

