## JOHN G. WALLACE v. PINE TREE LUMBER COMPANY AND ANOTHER.

## PINE TREE MANUFACTURING COMPANY, APPELLANT.[1]

December 2, 1921.

No. 22,399.

**Log driving by independent contractors — defendant not liable.**

Plaintiff was driving timber on the Mississippi river between Lake Itasca and Lake Irving, while defendant's logs were being driven by Connor & Wilson under a written contract with defendant. Plaintiff recovered a verdict against defendant because of alleged wrongful use of the waters of the river. It is *held*:

(1) That the written contract under which the driving was done discloses that Connor & Wilson were independent contractors, and that there is no evidence warranting a finding that the contract does not express the true relation between the parties.

(2) No facts or circumstances were shown from which an inference would be permissible that defendant assumed control over the use of the dams and waters by which the logs were transported, or gave Connor & Wilson any orders or directions with reference thereto.

(3) Liability could not be created on the theory that the work let to Connor & Wilson could not be done without causing injury or damage to plaintiff, for the river could be properly used by any one for transporting logs and timber products.

Action in the district court for Morrison county to recover $20,372 damages for interference with the waters of the Mississippi river by means of certain dams. The answer alleged that the Mississippi river was a navigable river and waterway. The case was tried before Roeser, J., who when plaintiff rested and at the close of the testimony denied defendant's motion for a directed verdict, and a jury which returned a verdict for $6,000. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed with directions.

[1]Reported in 185 N. W. 500.

*E. E. McDonald, A. H. Vernon* and *Clapp & Macartney,* for appellant.

*Marshall A. Spooner* and *Elmer A. Kling,* for respondent.

HOLT, J.

Plaintiff in the spring of 1919 was driving logs, ties and pulpwood on the Mississippi river between Lake Itasca and Lake Irving, near Bemidji. He brought this action to recover damages on account of the wrongful interference by defendant with the waters of the river by means of the operation of certain dams, while its logs were driven behind plaintiff's. He recovered a verdict of $6,000. Defendant appeals from the order denying its motion for judgment notwithstanding the verdict or a new trial.

The defendant is a corporation engaged in the manufacture and sale of lumber. It has for years operated a sawmill at Little Falls, and secured timber and logs from 1915 to 1919, in part, from Itasca State Park and adjoining territory. In 1915 a contract was made with Connor & Wilson, a logging firm, to cut and deliver the logs on board of cars at Lake Irving. At the expiration of that contract, and on August 22, 1918, defendant again made a contract with Connor & Wilson, by which the latter agreed to cut, haul, drive and deliver loaded on cars, at Lake Irving, all the pine, spruce, tamarack and other timber suitable for mercantile sawlogs which defendant should mark or designate to be cut on certain described lands.

The contract is very lengthy and specific. Connor & Wilson agreed to cut all timber marked by defendant that will make sawlogs acceptable to it; to cut all timber where it is smooth to 6 inches at the top; to cut all logs, where timber is not broken, into lengths from 12 feet upward, and as long as might be directed by defendant; the logs were to be square butted, well trimmed, and cut in a good and workmanlike manner and to the entire satisfaction of defendant; the logs cut were to be banked on Itasca and Elk lakes and driven to Lake Irving during the driving season following the cutting and hauling, and there loaded on cars on a spur track of designated size to be constructed by Conner & Wilson at their expense, except they were not to furnish the rails and

anglebars; Connor & Wilson were to construct and maintain, at their own expense, all dams and other improvements required for the driving of said logs to where the same were to be loaded, and were to pay all damage for overflow and all other charges of whatsoever nature in securing, raising or maintaining a head of water on Lake Itasca, and all other lakes and streams required for driving the logs; the minimum to be loaded on a car was to be designated by defendant, but such minimum should not exceed 6,600 feet; Connor & Wilson were to burn slashings to the satisfaction of the state authorities, and were to pay for suitable sawlogs left standing, lying or being on any of the lands to be cut or on any logging road at the rate of $11 per M feet, and the same for logs left along streams and lakes, except dead heads or sunken logs; Connor & Wilson were to board in their camps free of charge agents appointed by defendant to look after its interests under the contract. For the work to be performed by Connor & Wilson, defendant agreed to pay them $11 per M feet, at certain specified times for the logs cut, driven and loaded under the contract, and defendant was to furnish or cause to be furnished the rails and anglebars for the spur track mentioned, to equip the cars upon which the logs were to be loaded, but was not to be responsible for the delays or shortage of cars by the railroad company.

It was mutually agreed that Connor & Wilson should cut all the logs designated, and drive and load them as early as possible during the driving season of 1919; the logs were to be scaled on the landing where banked by competent scalers agreed on, each to pay half the wages of the scalers, but Connor & Wilson were to board them free, or, at the request of either party, the surveyor general of the district might scale the logs; Connor & Wilson agreed to deliver the logs free of liens; should Connor & Wilson fail or neglect to perform the conditions of the contract, then defendant in its discretion might take possession of the logs and of the property of Connor & Wilson used in the work, and complete the contract, and the reasonable expense of so doing to be paid by Connor & Wilson; if defendant purchased additional timber adjoining the lands to be cut, Connor & Wilson were to log the same in the manner and for the price stipulated for the timber on the lands de-

scribed in the contract; Connor & Wilson were to open and keep separate accounts on their books, showing the disbursements and liabilities on all matters relating to operations under the contract, and showing the actual cost of the logging operation, the accounts to be at all times open to the inspection of the auditor of defendant, so that it might be advised of the actual conditions when payments are to be made to Connor & Wilson and for other purposes, and lastly that should Connor & Wilson faithfully perform the obligations resting upon them within the time specified, they were to have an additional payment of one dollar per thousand feet, when the work was so completed.

Under this contract Connor & Wilson cut and had banked on Elk and Itasca lakes over 9 million feet of logs by the middle of April, 1919, some 5 million thereof being in or on Elk lake, which opens into Itasca by a creek a few rods in length. Upon this creek was a sluice dam, by which the waters in Elk lake could be held back and raised above those in Itasca. The outlet of Itasca lake is the Mississippi river, and across the river about a quarter of a mile from the lake is a dam, with gates and sluiceway. Ten or twelve miles below is another dam, by which waters can be accumulated so as to float logs over the 5 mile rapids below, called Phelps Rapids. Some 10 or 15 miles further down LaSalle river, the outlet of LaSalle lake comes in. There was a dam at the outlet of the last named lakes by which a 9 foot head of water could be accumulated. The dam at the outlet of Lake Itasca, is under the control of the state forestry board, the one at LaSalle appears to be owned by one Busch. Connor & Wilson, in the fall of 1918, made arrangement for a permit from the forestry board to raise the water in Itasca, and purchased from Busch the right to fill the LaSalle lake to the capacity of the dam. Both were filled to overflowing prior to April 1, 1919. Plaintiff had about 180,000 feet of small timber strung along the Mississippi above the outlet of LaSalle river. He had nearly 3,000,000 feet banked below that outlet. His principal claim is that he was not given sufficient water to move the 180,000 feet he had above LaSalle river, before Connor & Wilson began sluicing defendant's logs. Plaintiff began driving April 13, and Connor & Wilson, April 29. Connor

& Wilson's drive came upon plaintiff's rear in the middle of Phelp's Rapids.

The chief contention of defendant is that whatever was done in respect to driving its timber was done by Connor & Wilson, independent contractors, for whose acts defendant is not responsible. The contract between Connor & Wilson and defendant is drawn with care and is clear and specific in its terms. From it the court must determine the relation of the parties, unless there be evidence that it is a mere ruse, or that defendant did in fact assume direction of the matters complained of and that Connor & Wilson therein acted as defendant's agents or servants. Plaintiff was not concluded by the written document, not being a party to it. But we have examined the record with care, and do not find any testimony from which the inference would be permissible that the written instrument was not a bona fide agreement of the parties and the sole criterion of their obligations. There is not a particle of evidence tending to show Connor & Wilson to be irresponsible parties to serve as scapegoats for defendant. There is no intimation that they received or were to receive help or credit extensions from defendant while doing the work. They evidently were provided with the necessary tools and camping outfits, bought and paid for the provisions needed, hired and paid the men without any aid from defendant, except as derived from the payments stipulated in the contract.

Construing the contract itself in the light of the surrounding circumstances most favorable to plaintiff, neither court nor jury is warranted in reaching any other conclusion than that Connor & Wilson, in the driving of defendant's logs, were independent contractors. The supervision provided for in the contract, merely is to assure certain results, and does not tend to control the manner or means of reaching such results. To that end were the provisions that the logs cut should be banked on the lakes from which they could be floated to destination; that the trees to be cut and the lengths into which they were to be cut should be designated, and that agents of defendant might examine the books to ascertain that the results contracted for were being accomplished. There is no provision looking toward a direction by defend-

ant as to how the driving of the logs should be done, or how the necessary water was to be provided. On the other hand, Connor & Wilson expressly undertook to do that at their own expense.

In Barg v. Bousfield, 65 Minn. 355, 68 N. W. 45, this rule from Shearman & Redfield on Negligence (4th ed.) § 164, is applied and approved: "The true test, as it seems to us, by which to determine whether one who renders service to another does so as a contractor or not, is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished." In the Barg case the decision turned upon contradictory testimony of defendant as to control of the work and the means to accomplish the result.

In Rait v. New England F. & C. Co. 66 Minn. 76, 68 N. W. 729, it is said: "In every case the decisive question in determining whether the doctrine of respondeat superior applies is, had the defendant the right to control in the given particular the conduct of the person doing the wrong? If he had, he is liable. On this question the contract under which the work was done must speak conclusively, in every case reference being had, of course, to surrounding circumstances." At the time the wrong herein complained of took place, defendant had no right to interfere with Connor & Wilson's manner of driving or use of the river. They were not in default so that defendant could have assumed control. They had the logs cut and banked, and had provided for the water needed to drive them.

Klages v. Gillette-Herzog Mnfg. Co. 86 Minn. 458, 90 N. W. 1116, relied on by respondent, turned on the point that the evidence revealed that the contract relied on did not disclose the true relation of the parties. There is no testimony justifying such conclusion here.

Brown v. Douglas Lumber Co. 113 Minn. 67, 129 N. W. 161, was decided on the proposition that the mill, in which the injury happened, was furnished by the defendant, and the manner of using it was to some extent under its control. State v. District Court of St. Louis County, 128 Minn. 43, 150 N. W. 211, was a compensation case, where the workman instead of wages was paid by the piece.

The question remains whether there are any attending circumstances, under the decisions stated, which would allow a jury to find that the contract does not express the true relation of the parties, or that Connor & Wilson yielded their rights thereunder and became the mere agents or servants of defendant. The fact that defendant was very anxious to get these logs cut and loaded on the railroad cars as early as possible in the spring of 1919, and that it took all precaution to have this accomplished and the work well done, cannot be permitted as proof that the relation between the parties was other than disclosed by the contract. Nor can the fact that it was understood that the logs were to be floated down the river, and that this ordinarily could not be done except water was accumulated and controlled by means of the dams mentioned, be a circumstance tending to prove a relation of master and servant between defendant and Conner & Wilson. There is nothing else in the record, except certain alleged admissions of an agent of defendant, hereinafter to be noted, that indicates the slightest effort on the part of defendant to control or interfere with that part of the work which Connor & Wilson was to perform without defendant's specified direction. There was nothing specified as to the means and manner in which the logs were to be driven. This contract, drawn with care and specific as to the obligation of both parties, running over almost a year, and involving work and labor to the amount of about $100,000, must be taken as conclusively establishing the relation of Connor & Wilson as independent contractors in the absence of some positive or substantial testimony pointing to the contrary.

The only other matter upon which plaintiff claims a right to go to the jury is this: Hinkle, a managing agent of defendant, was at Lake Itasca, once in January, 1919. Again, on May 27, 1919, he and two officers of defendant took an automobile trip along the river and noted the conditions of the drive. On the last named trip, Hinkle, evidently doubting the presence of the number of men asserted to be on plaintiff's drive, asked to see his time books. After looking at these, it is claimed, Hinkle said, in substance, that if he had known that plaintiff had so many men he, Hinkle, would have ordered more water released. There was evidence that in the middle of April when plaintiff requested some

water to move his logs over Phelps Rapids, the man placed in charge of the Itasca Lake dam, on the order of Wilson, took off some boards on the dam, and increased the flow. Indeed, he never refused water when requested by plaintiff, but the complaint is that it was not released in adequate quantity and at proper times.

Even if Hinkle made the statement attributed to him, it does not tend to prove the relation of master and servant between defendant and Connor & Wilson. It was at most a casual remark made after the alleged wrong had been committed, and could hardly serve as an admission binding on defendant. It might well be that if plaintiff, when he needed water, had appealed to defendant, the latter could have prevailed on Connor & Wilson to release more than what they did. But that does not tend to prove that either Hinkle or defendant had in fact exercised any control over Connor & Wilson in respect to the waters they had accumulated. The evidence fell far short of indicating the existence of any fact or circumstance tending to prove that defendant had given any direction as to how the water was to be accumulated, held or released in the dams, or that it was its duty or within its power so to do.

It is true that, notwithstanding Connor & Wilson were independent contractors, defendant might nevertheless become liable for their torts committed at its behest or direction. But, as stated, the record contains no basis for finding that defendant did anything of the sort, or ever exercised any authority over the use of the waters in question.

The only other possible theory, upon which to ground a liability against defendant for what Connor & Wilson did in driving these logs, would be that the work contracted for could not be done without wrongfully interfering with plaintiff's use of the river. But there is no basis in the record for a recovery upon such ground. Plaintiff as well as Connor & Wilson depended on the waters of the lakes and river to float their timber. Each had a right to the use thereof for such purpose, so long as the like right of others was not unreasonably interfered with. There is nothing indicating that defendant's logs could not have been driven without doing injury to plaintiff or impeding him in the transportation of the timber he had in charge. The Viken dam was abso-

lutely necessary in order to float any timber over Phelps Rapids. Both Connor & Wilson and plaintiff were dependent upon its use. It could be used properly to facilitate driving. So could the dams controlling the outlet of Elk, Itasca and LaSalle lakes. That more water was accumulated by the dam at the outlet of Itasca lake than the permit of the state forestry board authorized, could not have harmed plaintiff, for the overflow was of the same volume as if there had been no dam when plaintiff began driving, and an excess accumulation of water, if anything, would benefit him as well as Connor & Wilson. The same would be true of the dams at the outlets of Elk and LaSalle lakes. The waters accumulated by these dams during the winter and held after the dams were filled, could not have impeded or destroyed plaintiff's proper use of the river, for, as already stated, the overflow was then the same as if no water were held back by dams. Indeed, without the use of such dams neither plaintiff nor Connor & Wilson could have driven any timber on the river to advantage. With the dams there and properly managed, logs and timber could be lawfully transported on the river. There can, therefore, be no valid contention that defendant contracted for something that could not be accomplished without wronging plaintiff. Our conclusion is that defendant's motion for judgment notwithstanding should have been granted.

The order is reversed with direction to enter judgment in favor of defendant notwithstanding the verdict.