## QUINN v. SOUTHGATE NELSON CORPORATION.

District Court, S. D. New York.

Jan. 16, 1941.

Gazan & Caldwell, of New York City, for plaintiff.

874

Tompkins, Boal & Tompkins, of New York City, for defendant.

MOSCOWITZ, District Judge.

This case was tried by the Court without a jury, jury having been waived.

On the morning of January 10, 1939, the Steamship Waukegan, owned by the United States Maritime Commission and operated by the defendant, was proceeding up the Delaware and Chesapeake Canal at St. Georges, Delaware, and while attempting to pass through the center span of the St. Georges Bridge which was fully opened to permit the vessel's passage, crashed into the bridge causing the death of the plaintiff's intestate who was on the bridge in the course of performing his duties as bridge tender. This action is brought by the decedent's widow to recover damages for his wrongful death.

■ At the time of the accident the passage through the bridge was clear, visibility was between two and three miles, tide and current were normal, wind was light, and there was nothing which seemingly should have interfered with the safe transit of the vessel through the bridge. Only a short while before another steamship of substantially the same size as the Waukegan had successfully passed through the bridge without encountering any difficulty. In fact, the records of the canal show that hundreds of uneventful trips have been made through the canal by vessels of equivalent size, and some by this same vessel. Yet the Waukegan crashed into the bridge.

The facts are such therefore as to make applicable the doctrine of res ipsa loquitur. Attempts have been made to explain the accident on the ground of an unusual current, but the facts do not bear out that explanation. From what appears in the record, it would appear that the accident probably occurred by reason of improper trim of the vessel occasioned by being too heavily loaded forward and too light in the after part, resulting in inability to make the ship respond to her rudder. Whatever the case may be however, responsibility for the accident is unquestionably to be placed upon those who had physical custody of the Waukegan.

■ Under these circumstances, the defendant bases its asserted non-liability upon the contention that the operating agreement and practice thereunder were such as to make the master of the Waukegan, its officers and crew, the agents of the United States Maritime Commission, a governmental agency, and not of the defendant, Southgate Nelson Corporation. The defendant claims therefore, that any acts of negligence are not to be ascribed to it, but to the United States Maritime Commission.

The operating agreement between the United States Maritime Commission and Southgate Nelson Corporation under which the Waukegan, among other vessels, was operated, designated the latter as managing agent "to manage, operate, and conduct the business of the Line * * *." The managing agent was "to man, equip, victual, supply and operate the vessels, subject to such restrictions and in such manner as the Owner may prescribe, * * *." Paragraph 7 of the agreement provided in part as follows: "The Licensed Officers and Chief Steward, however, are to be subject to the approval of the Owner, and the Owner shall have the right to require the removal of any of such employees if it shall have reason to be dissatisfied."

It thus appears that actual choice of the ship's personnel was in the hands of the defendant although the owner retained a veto power with respect thereto. Actual operation rested with the defendant although the owner retained the right to issue restrictions. Under such circumstances, it is difficult to see how the defendant can claim complete freedom of responsibility for the acts of the ship's master whom it selected. Granting that the owner reserved a veto power over the actions of the defendant, yet the initial selection of the Waukegan's officers rested with the defendant and immediate supervision rested with it. It was not clothed with the sovereign immunity of the owner since as is well established, "the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work." See Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 388, 59 S.Ct. 516, 83 L.Ed. 784; see also, Sloan Shipyards Corp. v. United States Shipping Board E. F. Corp., 258 U.S. 549, 567, 568, 42 S.Ct. 386, 66 L.Ed. 762. The defendant had the full power to control the actions of the master. With that went responsibility for his acts.

Aside from the foregoing, however, the agreement between the owner and the defendant placed upon the defendant responsibility for the conduct of the agents chosen

by it. Thus Paragraph 23 of the agreement provided as follows: "Any agents selected or appointed by the Managing Agent shall be solely the agents of said Managing Agent and not, in any respect, the agents of the Owner. The Managing Agent shall be responsible to the Owner for any action taken by any of said agents. Such agents shall, however, be subject to disapproval by the Owner and any agency agreement shall be terminated by the Managing Agent if the Owner shall so request. Any compensation payable by the Managing Agent for services rendered in connection with the Owner's vessels shall be subject to approval by the Owner." It is likewise significant to note in passing, although by no means determinative, that Paragraph 14 of the agreement required the defendant to provide protection and indemnity insurance, which might indicate that the parties themselves viewed the defendant as being the responsible party.

Since the master was the subagent of the defendant, responsibility for the negligent operation of the vessel must rest upon it. As stated in the Restatement of the Law of Agency, § 362, "An agent is liable to third persons for the conduct of subagents and of his servants under the same conditions which make a principal liable for the conduct of an agent or servant."

There remains only the question of damages. The plaintiff, as the wife of the decedent, testified that, at the time of his death, he was 46 years of age and earning $130 per month. She stated that of the $130, $125 per month was given to her. Obviously, when one considers that the decedent's uniforms alone cost $40 per year, the amount which he could have turned over to his wife per month for her support must have been less than $125. Although there is. nothing in the record to supplement or refute the widow's testimony the Court can take judicial notice of the fact that the actual pecuniary loss of the plaintiff and her children as a result of the death of her husband was less than the $125 to which she testified.

In computing the sum of money which will compensate the plaintiff, she has argued that only her husband's life expectancy be considered, whereas the defendant contends the tables of joint expectancy of husband and wife are to be used. Clearly, the latter should be applied since the plaintiff's loss must be measured by the period during which it was to be expected that plaintiff and the decedent were alive together. Otherwise, she would be receiving compensation for a loss she has not sustained. This was the rule applied in Briscoe v. United States, 2 Cir., 65 F.2d 404. The rule is not different in Delaware for in Lockerman v. Hurlock, 2 W.W.Harr. 479, 125 A. 482, the Delaware Court determined the measure of damages to be the income the plaintiff would have received from the decedent, as his wife, if he had lived.

After making due allowance for further expenses of the decedent out of the $130 a month earnings he received, and after applying the joint tables of expectancy, and after consideration of all the factors upon which damages are to be predicated, the Court finds that plaintiff is entitled to recover $20,000 in damages from the defendant.

Settle findings and judgment on notice.