# DIMPLE MADDUX GILL v. NORTHWEST AIRLINES, INC.[1]

April 1, 1949.

No. 34,646.

[1]Reported in 36 N. W. (2d) 785.

*Bundlie, Kelley, Finley & Maun* and *Mandt Torrison,* for appellant.

*John W. Graff,* United States Attorney, and *Linus J. Hammond,* Special Assistant United States Attorney, for respondent.

THOMAS GALLAGHER, JUSTICE.

Action for the wrongful death of plaintiff's decedent, a naval officer, who was killed while traveling on a contract carrier plane

operated by defendant for the United States government in the "northern-region operation" in Alaska on September 18, 1944, during the late war. At the conclusion of the trial the court directed a verdict for defendant. Plaintiff appeals from an order denying her motion for a new trial.

The "northern-region operation" included western Canada and part of Alaska. Defendant, with other airlines, was engaged in transporting men and material to Alaska, a war zone, in preparation for threatened enemy attack in that area, and to facilitate delivery of lend-lease equipment to Russia, under a contract with the United States made pursuant to 55 Stat. 838 (1941), 50 USCA, § 601, et seq., and to Executive Order No. 9296 (January 30, 1943), 50 USCA Appendix, § 611 note, 8 Fed. Reg. 1429.

The contract, preceded by "Letters of Intent," which briefly described the work to be performed by defendant thereunder, set forth that the war department had set aside certain sums to defray the cost of the prescribed operations and provided for defendant's compensation on a cost-plus-a-fixed-fee basis. It further provided that the United States should reimburse defendant for any losses it might sustain by reason of the death or bodily injury of any person, or by reason of the loss or destruction of or damage to any property arising out of the performance of the required services. By virtue of this provision, the United States, through its attorney, acts as counsel for defendant herein.

The plane on which plaintiff's decedent was traveling left Anchorage on September 18, 1944, at 7:12 a. m., Alaskan wartime, on a routine flight to Fairbanks. It was daylight, and there was an overcast. The pilot, Roy Proebstle, employed by Northwest Airlines, reported to his superiors at 7:30 a. m., that date, that he was "on top," or at least 500 feet above the overcast at 9,000 feet, and requested a change in flying altitude from 11,000 to 9,000 feet. This request was granted. At 7:34 a. m., Proebstle reported that he was cruising at 9,000 feet and estimated that he would be over Talkeetna, a point between Anchorage and Fairbanks, at 7:44 a. m. At 7:42 a. m., he requested a "continuous carrier" from the Talkeetna radio

station. At 7:44 a. m., the engines of his plane could be heard over Talkeetna. He reported in again at this station at 7:45 a. m. Thereafter no further messages were received from him.

The wreckage of the plane was discovered three days later at the head of Eldridge Glacier near Mount McKinley, about 40 miles west of the beamed airway between Anchorage and Fairbanks. It had crashed into a 12,000-foot peak at an altitude of 11,400 feet. A searching party reached the scene on foot in November of that year. It found no trace of any human being. See, Onstad v. State Mut. L. Assur. Co. 226 Minn. 60, 32 N. W. (2d) 185; Onstad v. Minnesota Mut. L. Ins. Co. 226 Minn. 546, 33 N. W. (2d) 691.

Plaintiff, special administratrix of the estate of decedent, who had been directed by his superior officers to make the trip, brought action for his wrongful death, alleging (1) that it was caused solely by defendant's negligence in operating the plane at too low an altitude and in flying off the chartered beamed airway while the plane was within its exclusive control; and (2) that the crash was caused by the defective condition of the plane and that such defects should have been known to defendant, which had exclusive control of the plane.

At the close of the testimony, defendant moved for a directed verdict on the grounds (1) that the work performed by defendant was a governmental function and entirely a public service; that defendant's employes were integrated in and became a part of a military organization; that the United States government, through its military agencies, had complete control of the operations; that the facilities furnished to defendant were completely owned and controlled by the United States government; and that defendant had no separate identity in the operation whatsoever; (2) that plaintiff had failed to prove any negligence on the part of defendant proximately causing the accident; and (3) that, because of the control vested in the United States, the doctrine of *res ipsa loquitur* had no application. The trial court granted defendant's motion, but did not specify on which of the above grounds its order was based.

The issues here for determination are: (1) Was defendant an independent contractor in the "northern-region operation," and, as such, under the doctrine of *respondeat superior,* liable for the negligence of its employes; (2) was there sufficient evidence of negligence to require submission of this issue to the jury; and (3) in the absence of evidence of specific acts of negligence, did the doctrine of *res ipsa loquitur* become applicable?

■ It is well settled that defendant, because of its contract with the United States, did not by virtue of that fact alone become an agent of the United States so as to gain governmental immunity for its acts. See, Keifer & Keifer v. R. F. C. 306 U. S. 381, 59 S. Ct. 516, 83 L. ed. 784; Prato v. Home Owners' Loan Corp. (1 Cir.) 106 F. (2d) 128. Defendant asserts, however, that notwithstanding this it was not an independent contractor in this operation, but that the control by the United States over the same was such that the United States became the employer of all personnel engaged in the operation under the contract.

■ The written agreement between the United States and defendant does not in itself necessarily solely govern this question. The doctrine of *respondeat superior* may depend not only upon the terms of a contract between parties thereto, but the conduct of the parties operating thereunder as well. As stated in Alansky v. Northwest Airlines, Inc. 224 Minn. 138, 147, 28 N. W. (2d) 181, 187:

"It should be noted, however, that even though the contract and facts pleaded in said paragraphs set up a valid defense, we cannot now determine therefrom alone the relationship that existed at the time of the accident between defendant and the United States, or between defendant and the pilots of the plane; nor defendant's responsibility otherwise in connection with the accident. This rule is expressed in Anderson v. Foley Bros. 110 Minn. 151, 153, 124 N. W. 987, 988, as follows:

" '* * * The law on this subject is well settled. The contracts themselves do not necessarily govern the question, and the relation

of respondeat superior may depend entirely upon the conduct of the parties.'

"See, also, Aldritt v. Gillette-Herzog Mfg. Co. 85 Minn. 206, 88 N. W. 741; Brown v. Douglas Lbr. Co. 113 Minn. 67, 129 N. W. 161; Wallace v. Pine Tree Lbr. Co. 150 Minn. 386, 185 N. W. 500."

■ As indicated in the cases referred to, there is no one particular test or type of conduct which determines whether a person is an independent contractor. Each case must be decided upon the facts there presented. 56 C. J. S., Master and Servant, § 3(2); 27 Am. Jur., Independent Contractors, § 5; Restatement, Agency, § 220. Some of the factors considered by the court in determining the question are: (1) Control of the work; (2) control of the premises; (3) control over the means of performance; (4) nature of the work done; (5) supervision of work; (6) control of personnel; (7) furnishing of personnel and material; (8) method of payment; (9) freedom of the contractor in employment policy; and (10) procurement of insurance covering personnel, social security payments, and like items. These tests are fully discussed with numerous citations in the above references.

■ Applying these tests to the instant case, it is clear that the evidence presented at least a question for the jury as to whether facts existed which might establish an independent-contractor relationship. As stated in Wallace v. Pine Tree Lbr. Co. 150 Minn. 386, 392, 185 N. W. 500, 503:

"The question remains whether there are any attending circumstances, under the decisions stated, which would allow a *jury* to find that the contract does not express the true relation of the parties, or that Connor & Wilson yielded their rights thereunder and became the mere agents or servants of defendant." (Italics supplied.)

See, also, Barg v. Bousfield, 65 Minn. 355, 68 N. W. 45; Rait v. New England F. & C. Co. 66 Minn. 76, 68 N. W. 729; Brown v. Douglas Lbr. Co. 113 Minn. 67, 129 N. W. 161, all holding this issue may under certain circumstances be one for the jury.

■ It is true that under the terms of the agreement the United States reserved the right to and did exercise a high degree of supervision and control over much of the work performed by defendant. It is likewise true that thereunder defendant's operations became merged with the military operations of the United States in this area under command of the United States army. Such factors, however, did not necessarily destroy defendant's identity as an independent contractor nor make its employes the servants of the United States. As was stated in Jackson v. Northwest Airlines, Inc. (D. C.) 75 F. Supp. 32, 35, a case involving a similar issue under identical contractual provisions: ,

"Defendant, not the United States Government, was the employer of each plaintiff. Defendant was not the agent of the Government in the employee sense. It was an independent contractor. * * * The mere fact that the Government determined what work was to be done on the planes and inspected the planes after defendant completed the work on them is not important here. Anyone who hires another to perform work as an independent contractor states the work to be done, often in some detail. Defendant here was hired to perform the work set out by the Government, not to determine what work was to be done according to the military needs of the plane."

In the instant case, many factors were present from which a jury might conclude that defendant was acting as an independent contractor in the performance of the services above described. It employed its own personnel. Some of the equipment used belonged to it. Other equipment was assigned to it by the United States. Its pilots had final authority to determine whether a particular flight was to be made. They were in complete control of the planes while in flight. Defendant's supervisory personnel had immediate control of all employes, including the pilots. Defendant exercised complete control over the hiring, discharging, and transferring of its employes, subject only to a general veto power from the military authorities in certain cases. (This latter factor, in itself, would

not nullify the independent-contractor relationship. See, Quinn v. Southgate Nelson Corp. [D. C.] 36 F. Supp. 873.) Defendant paid its employes from its own bank accounts. Its labor relations and seniority policies were continued throughout the entire operation under collective bargaining agreements between it and certain labor organizations representing its employes. It deducted social security payments for its employes and provided workmen's compensation and other insurance protection for them. All of such factors would reasonably sustain a jury finding that defendant was an independent contractor and, as such, liable for the negligence of its employes under the doctrine of *respondeat superior.*

■ Notwithstanding the fact that the jury may have determined that an independent-contractor relationship existed between the United States and defendant, making the latter liable for any negligence in the maintenance of the plane or in the conduct of its employes on the flight in question, we must still determine whether there is sufficient evidence of negligence to require submission of this issue to the jury.

Examination of the record convinces us that the evidence viewed in the light most favorable to plaintiff would reasonably sustain a finding of negligence against defendant. The plane was in satisfactory condition at the time of the take-off and continued to function properly thereafter according to the pilot's reports. While over Talkeetna, partway on the flight, it had no difficulty in maintaining contact with the radio station for the purpose of obtaining authority to change the flight elevation to 9,000 feet. It was the duty of the pilot to report by radio any difficulties encountered or any defects in the plane's mechanical equipment. No such reports were made. It struck the mountaintop under full power, indicating that both motors were in full operation at the time.

The plane crashed at an elevation of 11,400 feet approximately 40 miles west of its course. The weather report records indicate that throughout the period involved the wind direction was from west to east. There is no evidence of unusual weather conditions or storms which would account for the plane's leaving its course. The

regular airway route, which it was the pilot's duty to follow, has a top elevation of 8,000 feet insofar as obstructions are concerned. A plane flying at 9,000 feet as authorized would encounter no obstacles on this route. It was radio-beamed so that a pilot could tell with accuracy whether he was deviating therefrom to the right or to the left. Neither the army nor defendant, both of which investigated the accident, found any basis for assuming radio failure with respect to such beams.

An additional radio facility at Talkeetna provided a "continuous carrier" or signal. The plane was equipped with a directional finder, so that the pilot at all times was able to tell his position with reference to this station. Thus, if forced from the regular course, he could relocate it through such continuous carrier signal. At 7:42 a. m., the pilot requested this continuous carrier, which was then turned on. Thereafter, it appears that he left the course and continued in a strictly northerly direction instead of turning northeasterly, as the route required. Two stations north of Talkeetna reported hearing the plane's motor overhead. The request for a continuous carrier at this time could well indicate that it was the pilot's intention to leave the beamed airway, and that he requested the continuous carrier so that he would have no difficulty in returning to it later.

The terrain to the west of the airway, where the plane then proceeded, is described in the record as the most dangerous in the country. Mount McKinley rises to some 20,300 feet, and many peaks in the same range rise to well over 14,000 feet. It was suggested that it was a custom among pilots to deviate from the course contrary to instructions for the purpose of taking photographs of Mount McKinley, some 40 miles to the west of the beamed airway. Defendant's witnesses denied that this was a "practice." The total lack of evidence to explain why the plane left the beamed airway would indicate that the pilot's action in this connection was deliberate. At any rate, a jury might so find.

■ Likewise, the jury may well have found that the pilot's action in leaving the airway without authorization, because of the terrain

then to be encountered, constituted negligence, rendering defendant liable for the subsequent crash. It has been held that the driver of a car who leaves the traveled portion of a public highway may be guilty of contributory negligence. See, McChesney v. Dane County, 171 Wis. 234, 177 N. W. 12. Likewise, the driver of a taxicab was held negligent in transporting his passenger over a dangerous route when safer routes were known to him. See, Hathaway v. Coleman, 35 Cal. App. 107, 169 P. 414. The appellate division of the supreme court of New York has held that facts similar to those here involved formed a sufficient basis to support a jury's finding of negligence. See, Goodheart v. American Airlines, Inc. 252 App. Div. 660, 1 N. Y. S. (2d) 288.

In the Goodheart case, as might be found here, the pilot voluntarily deviated from his prescribed route without authority. His radio reports ceased, and the plane was found some 50 miles from such course, where it had crashed into a mountain at an altitude higher than that authorized for the flight. There, as here, there were no substantial changes in weather conditions. The plane was in good working order, and defendant asserted that it had done everything possible to insure a safe flight. The court held, however, that the facts recited were sufficient to support a finding of negligence.

We feel that the rule expressed in the New York decision is sound and should be applied here. It follows that the trial court erred in directing a verdict for defendant.

■ Because of our conclusion on this issue, it is unnecessary to determine whether the doctrine of *res ipsa loquitur* would have been applicable. See, Heffter v. Northern States Power Co. 173 Minn. 215, 217 N. W. 102.

The order of the trial court denying plaintiff's motion for a new trial must be reversed.

Reversed.