ISABELLA ORCHARD v. NORTHWEST AIRLINES, INC.
ORA B. PARRISH v. SAME.
ELIZA HOBBS v. SAME.[1]

February 15, 1952.

Nos. 35,402, 35,403, 35,404.

[1]Reported in 51 N. W. (2d) 645.

*Clarence U. Landrum,* United States Attorney, and *Linus J. Hammond,* Special Assistant to United States Attorney, for appellant.

*Bauers & Carlson, Robert W. Barnett, William H. DeParcq,* and *Chester D. Johnson,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Plaintiffs brought these actions to recover damages from defendant as the result of a plane crash that occurred at Billings, Montana, December 8, 1945, in which plaintiffs' decedents met death. The plane was a military plane, and all of its occupants, including decedents, were troops of the United States being transferred from Camp Kilmer, New Jersey, to Paine Field, Seattle, Washington. The pilots and certain other services were furnished for the operation by defendant.

A number of cases have arisen as a result of the accident. Some of them have been determined, and others are still pending. In 1947, this court had before it the case of Alansky v. Northwest Airlines, Inc. 224 Minn. 138, 28 N. W. (2d) 181, arising therefrom, which involved a question of pleadings. In Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. (2d) 180, which also involved this accident, we affirmed verdicts returned in favor of defendant. In the Barnes case, on the issue of negligence, plaintiffs relied upon the doctrine of *res ipsa loquitur*. This issue and the issue of control were there submitted to the jury, so that it cannot be determined upon which of such questions the jury based its verdicts for defendant. In the present actions, plaintiffs presented evidence of negligence on the part of defendant's employes which, plaintiffs assert, supports a finding of negligence proximately causing the accident, regardless of the doctrine of *res ipsa loquitur*. Accordingly, the determination in the Barnes case is not *res judicata* in the present proceedings.

While the Barnes case was pending, the present cases were tried in Hennepin county. They resulted in verdicts of $12,000 each for Eliza Hobbs and Isabella Orchard, and $15,000 for Ora B. Parrish. Subsequently, defendant's motions for judgment notwithstanding the verdicts or for a new trial were denied, and these appeals taken from the orders to such effect.

Defendant's contentions on appeal are:

(1) The evidence established as a matter of law that the military forces of the United States had the power and right to control the

personnel on the project and did control the manner and means of performance of the services involved; hence, that no responsibility whatsoever rested upon defendant.

(2) The record contains no evidence of negligence either against defendant or the military forces of the United States in charge of the project.

(3) The service being performed was a public service and function in which defendant would be liable only for negligence in the selection of the personnel to perform the services; and, there being no evidence thereof, defendant must be absolved from liability.

(4) *The court erred in giving certain instructions to the jury.*

(5) The actions of counsel for plaintiffs in interrogating witnesses and in the formal argument to the jury constituted misconduct justifying a new trial.

It will not be necessary to restate the facts involving the accident or the agreements, letters, contracts, and other documents in effect between the United States and defendant governing this project, known as the Trans-Con Project. They have been fully set forth in our prior decisions, to which reference has hereinbefore been made.

■ In the Barnes case, 233 Minn. 410, 47 N. W. (2d) 180, *supra,* this court determined that the facts surrounding the creation of the agreement between the United States and defendant, the documents involved therein, the directives issued, and the actions of the parties thereunder, created a fact question for the jury as to whether the personnel operating the plane were the employes and under the direction of defendant or of the United States. By their verdicts in the instant case, the jury determined that the pilots controlling the plane were servants of Northwest Airlines at the time of the crash. Since exactly the same facts and circumstances are present here as were present in the Barnes case, it is obvious that our decision on this issue in the Barnes case must govern here. Based thereon, we must hold that the evidence outlined amply sustains the jury's determination of this question. See, also, Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785.

46

■ On the issue of negligence, plaintiffs presented evidence as follows: The Billings airport is located upon a plateau some 400 feet above the city. Radio contacts with the plane were first made at Billings by the Civil Aeronautics Administration tower operator at 1:59 a. m. December 8, 1945. The pilot reported his position as some 28 miles east of the Billings airport, flying at an altitude of 5,500 feet above sea level, or approximately 1,900 feet above the level of the airport. He reported that he had vertical visibility only. He was assigned clearance to enter the traffic pattern and advised that the wind at the airport was 20 miles from the north. He was instructed to land on runway 34.

The pilot had had substantial experience in landing at this particular airport. From such experience it can be concluded that he was aware that the rimrock upon which the landing field is situated is some 400 feet above the level of the surrounding terrain, and that it would be necessary to come in some distance higher than the rimrock to make a safe landing. At 2:11 a. m. this date, the tower operator sighted the plane south of the airport with landing lights on and flying westward between 200 and 400 feet above the plateau and some 600 to 800 feet above the level of the valley just south thereof. It proceeded westward beyond the field and commenced to turn to the left to maneuver in position for landing. As it made the turn, the tower operator lost sight of it. He observed it again just before the crash after it had completed the turn and was proceeding north with its landing lights on. He then realized that it was below the level of the rimrock and below the level of the field. By radio he immediately advised the pilot to "pull up." Almost instantly, however, the landing lights disappeared as the plane crashed at 2:13 a. m.

Witnesses established that the motors of the plane sounded normal just prior to the accident, and that they then heard a "gunning" of the plane's motors. Two passengers aboard the plane who survived the crash testified that the engines were running normally and had been raced just before the crash; that everything was normal and routine until the moment of the crash; and that until the

last moment neither had been given any indication by the pilots that the plane had been maneuvered below the rimrock.

An examination of the wreckage subsequently made by John F. Woodhead, Jr., chief pilot for defendant, disclosed that the wheels or landing gear were in landing position; that the landing flaps were extended as required; and that, while most of the instruments had been destroyed in the crash, the altimeters, which advise the pilot of his altitude, were intact and properly set. Examination of the engines and propellers revealed that normal power had been applied at the time of the crash and that the engines had been functioning normally.

A survey of the surrounding area established that the plane struck the tops of trees about 200 feet from where it came to rest. These were some 400 feet below the field and about a half mile from the edge of the rimrock upon which it is located. According to Woodhead, the plane was at least 400 feet too low at the time it hit the trees. He was unable to determine any mechanical difficulty with the plane that would account for the crash.

The vicinity of the Billings airport is not susceptible to downdrafts. The weather, while stormy, was not unusual, and another plane had landed on the airfield shortly prior to the crash. The pilot at no time reported any difficulty and gave no indication that anything was wrong. He did report that he had vertical visibility without forward visibility. The United States weather experts were of the opinion that light ice had formed on the windshield of the plane obscuring forward vision. There was evidence that, if visibility was poor so as to make landing hazardous, the pilot might land at either of two alternate airports a short distance away not in the snow-and-ice area; that he had ample fuel to reach such alternative landing fields; that he had full power and authority on his own determination to select another field for landing; that weather reports which he had in his possession indicated they were not in the ice-and-snow area; and that he was familiar with the situation but chose rather to make the landing at Billings.

Kenneth R. Ferguson, vice president of defendant, testified as to the possible causes for the crash. Most of these might indicate an error of the pilot in one form or another. Thus, the sudden application of power made just before the crash might cause a propeller to stall. Ferguson testified:

"* * * There are also the purely subjective types that might be represented by one or more classes of pilot failure.

*   *   *   *   *

"Mistake, human mistake on the part of the crew.

*   *   *   *   *

"There was only one thing, he [the pilot] was too low. Why was he too low is what you are asking. I just don't know.

*   *   *   *   *

"There is only one mistake, steering too low, just like you might steer your automobile into a tree. The reason why is the difficult thing.

*   *   *   *   *

"There are a number of things that might have made him make a single error, and the only error he could make was that he was too low in the wrong place.

*   *   *   *   *

"If he made an error his error could only have been that he was too low during his final approach.

*   *   *   *   *

"He was below the level of the field."

He testified that a downdraft was improbable. There was no suggestion of mechanical difficulty, sudden emergency, or act of God. On the contrary, all such factors were eliminated by the testimony of various witnesses.

The above evidence and much additional evidence not repeated here clearly established a jury question on the issue of negligence proximately causing the crash. Based thereon, reasonable minds might fairly have concluded that the pilot was negligent, and that his negligence brought about the fatal accident. See, Gill v.

Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785; Goodheart v. American Airlines, Inc. 252 App. Div. 660, 1 N. Y. S. (2d) 288.

■ With respect to the third contention of defendant, that since this work constituted public service its liability could only be based upon negligence in the selection of its personnel, reference is made to Gill v. Northwest Airlines, Inc., *supra,* which negatives defendant's contention in this respect. Therein we stated (228 Minn. 168, 36 N. W. [2d] 788):

"It is well settled that defendant, because of its contract with the United States, did not by virtue of that fact alone become an agent of the United States so as to gain governmental immunity for its acts. See, Keifer & Keifer v. R. F. C. 306 U. S. 381, 59 S. Ct. 516, 83 L. ed. 784; Prato v. Home Owners' Loan Corp. (1 Cir.) 106 F. (2d) 128."

■ As part of its charge the court instructed the jury:

"* * * it is the claim of the plaintiffs in this case that this accident was due primarily to the fact that the pilot, in the control of the airplane, let it get too low as it approached this airport, and that it got so low that it struck trees, and that in doing that the pilot was failing to do what the law requires of him, and he was, therefore, negligent."

Defendant asserts that, because no evidence was presented that the pilot had voluntarily allowed the plane to get so low that it struck the trees and therefore crashed, the above instructions were erroneous. As indicated above, ample evidence was presented during the trial to establish that the pilot may have been negligent in coming in below the level of the rimrock, so it would seem clear the court was justified in submitting this question to the jury as one of the important issues in the case. Immediately after giving this part of the charge, the court advised the jury of defendant's claim that negligence had not been proved and that the cause of the accident was, therefore, unknown. It further instructed the jury that "plaintiffs must prove negligence * * * by a fair prepon-

derance of the evidence," and that plaintiffs "do not have to prove it to an absolute certainty, nor should your verdict rest on guessing or speculation. \* \* \* The claim is that they were responsible for what the pilots did or did not do and that is the way I am submitting the matter to you."

Under all the circumstances and in light of the evidence presented, we find that the charge fairly presented the issue of negligence to the jury and that the language chosen was not erroneous. See, 6 Dunnell, Dig. & Supp. § 9784, and cases cited.

■ Defendant alleges that certain statements of counsel for plaintiffs in his closing argument constituted misconduct requiring a new trial. The trial lasted seven days. The arguments of both counsel are set forth in full in the record. Plaintiffs' argument covers 57 pages of the printed record. It consumed two and one-half hours at the trial. The statements complained of were as follows:

"Mr. Johnson [plaintiffs' counsel]:
\* \* \* \* \*

"I have presented to you every shred of evidence that has been available. Defendant's Exhibits 68 and 76 provided that in the event of crashing the Army make an investigation, make a report and then to report, submit, the probable causes of the crash. We have got everything here with a blue ribbon on it except that Army report.

"Mr. Hammond [defendant's counsel]: I object to that statement. He charges us with the responsibility. If he wanted to bring in the Army report, he could do so.

"The Court: You are not going to comment about that Army report?

"Mr. Johnson: I didn't have available the blue ribbon to me.

"Mr. Hammond: You could get a blue ribbon just like I got one.

"The Court: Just a minute, you are not going to comment on that, are you?

"Mr. Johnson: All right, your Honor."

The army report referred to had been ruled out as evidence. Plaintiffs' counsel did not thereafter persist in this line of argument and adhered to the court's admonition with reference thereto. Apparently defendant's counsel was satisfied at this point and thereafter made no further request for a direction that the jury be instructed to disregard counsel's statements or for other corrective action. In denying defendant's motion for a new trial on this ground, the trial court stated in its memorandum:

"Counsel for plaintiffs said some things he should not have said. They were corrected at the time. I do not believe his conduct was intentional, nor do I believe it justifies the granting of a new trial."

While counsel's references were outside the issues in litigation, it appears that counsel for defendant had repeatedly made references to the United States as being ultimately responsible for any verdicts returned by the jury, notwithstanding our admonition in Alansky v. Northwest Airlines, Inc., *supra,* to the effect that (224 Minn. 148, 28 N. W. [2d] 187):

"* * * The fact that defendant is represented by the United States attorney has no bearing on the material issues and should be kept from the jury."

Plaintiffs urge that disregard of our instructions on this point might justifiably be regarded as provocation for bringing in the remarks of their counsel with reference to the army report on the crash.

Ordinarily the granting of a new trial on the grounds of misconduct of counsel rests within the discretion of the trial court. 5 Dunnell, Dig. & Supp. § 7102, and cases cited. Here, in view of the lengthy arguments and the court's specific, detailed, and correct instructions on all the issues, as well as its admonition to counsel in the presence of the jury with reference to the challenged statements, and the conduct of both counsel for plaintiffs and defendant thereafter, as above set forth, we cannot say that it abused its discretion in holding that such remarks were not prejudicial to the extent of requiring a new trial in the interests of justice. See, Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. (2d)

180; Flemming v. Thorson, 231 Minn. 343, 43 N. W. (2d) 225; State v. Jansen, 207 Minn. 250, 290 N. W. 557; Eilola v. Oliver I. Min. Co. 201 Minn. 77, 275 N. W. 408; Moquin v. M. St. P. & S. S. M. Ry. Co. 181 Minn. 56, 231 N. W. 829; Powell v. Standard Oil Co. 168 Minn. 248, 210 N. W. 55.

Affirmed.

MR. JUSTICE CHRISTIANSON took no part in the consideration or decision of this case.