CAROTHERS, by General Guardian, and others, Appellants, v. BAUER and others, Defendants: ROCHESTER DAIRY COOPERATIVE, Defendant and Respondent.

*February 6—March 3, 1964.*

18

For the appellants there were briefs by *Wilcox & Sullivan* of Eau Claire, and oral argument by *Francis J. Wilcox*.

For the respondent there was a brief by *O'Brien, Ehrick & Wolf* and *F. J. O'Brien* and *Michael Berens,* all of Rochester, Minnesota, attorneys, and *Engelhard, Snodgrass & Goerdt* of La Crosse of counsel, and oral argument by *Richard V. Ehrick* and *Lawrence M. Engelhard*.

DIETERICH, J. The issues involved on the instant appeal are as follows:

(1) Whether the motion for summary judgment should have been denied for the reason that there are issues of fact present which require trial.

(2) Whether the trial court erred in determining that Komro was an independent contractor.

The affidavits reveal the following facts. In July, 1959, Komro purchased the truck which was involved in the collision from the estate of Robert Hophan. Hophan, prior to his death, had been a bulk milk hauler under contract with the Dairy on the same milk route currently operated by Komro. The total purchase price of $12,500 represented approximately $8,500 for the truck in question (and another truck also purchased from the estate), the equipment, and milk-hauling rights, and $4,000 represented consideration for goodwill. Komro stated that the Dairy did not participate in the negotiations or sale, and that it did not aid in financing the purchase of the truck and route.

The adverse examination of Louis Komro reveals that the Dairy kept all records; that Komro kept no record of either the amount hauled or the time spent; and that the truck and tank are used exclusively to haul for the Dairy and produce no other income of any other kind for him—although Komro stated in his affidavit in support of the motion for summary judgment that he sometimes hauls water in his truck for farmers and retains all charges for such hauling as his own. After Komro had been hauling for the Dairy for a time, he signed a written contract with the Dairy, dated July 25, 1959, which contained the following terms:

". . . The carrier, . . . promises and agrees that he will furnish . . . the pick up and delivery on alternate days (known as skip day pick-up) of whole manufacturing milk by means of suitable farm bulk pick-up tanks, between the processor's establishment at ———— and the respective farms and/or other places as listed, which list, it is hereby mutually agreed, shall be subject to alteration by the addition to or subtraction from the same of the names of farms and/or other places, from time to time, as designated by the processor except that no addition thereto which requires the carrier to travel more than two additional miles, may be added without consent of the carrier, . . . It is further mutually agreed that the processor retains the right to make any changes in its business policies, operations or methods without being liable in any way for loss of business or income directly or indirectly incurred by said carrier by reason of such changes. . . .

"The carrier shall transport on alternate days, Sundays and holidays included by means of suitable farm bulk pick up equipment supplied and maintained by him and at his expense and operated likewise at his expense, . . .

"It is further agreed and understood that such milk shall not be actually deemed to be delivered to nor become the property of, the processor until actual delivery to, and acceptance by, said processor at its establishment as aforesaid; and the carrier shall carry sufficient cargo insurance with a reliable insurance company, . . .

"In the event that the processor shall loan the carrier any equipment, including farm bulk pick-up tanks, the carrier shall maintain and operate such equipment at his own expense, and shall be responsible for, and take reasonable care of, any of such equipment, . . . the carrier shall carry insurance on any such equipment to the amount of its full insurable value with some reputable insurance company . . .

"Should an act of God . . . prevent the carrier from furnishing any kind of whole manufacturing milk pick-up service whatever . . . the carrier shall give to the processor notice of such inability to furnish such services as soon as it may be reasonably possible for him to do so . . .

"It is of the essence of this contract that transportation service herein agreed to be furnished by the carrier to the processor shall be reasonably satisfactory at all times . . . and the carrier shall at all times make prompt delivery to the processor's said establishment, the perishable nature of the whole manufacturing milk to be transported by the carrier being always given full consideration in this connection. Such transportation service from the standpoint of both the processor and the shipper shall be in accordance with the best accepted standards of whole manufacturing milk hauling, and shall conform to all applicable sanitary and health requirements imposed by public authority. . . .

"The carrier further covenants and agrees to save and hold processor harmless from any and all liability to third persons arising directly or indirectly out of this contract, . . . Pursuant to this paragraph, carrier agrees to carry property damage and public liability insurance, . . .

"Finally, it is expressly understood and agreed by each of the parties hereto that it is the true intent and meaning of this contract:

"1. That the carrier shall have full and complete liberty to use his own free and uncontrolled will, judgment and discretion as to method and manner of his performance of each and every obligation herein and hereby assumed by him, absolutely without any right whatever on the part of the processor to direct or control, in any way or in any degree his performances of any said obligations:

"2. That the carrier will furnish workmen's compensation insurance, if required by law, on his own employees;

also public liability and property damage insurance on all equipment used to furnish said transportation services; and

"3. That, anything herein, or in the previous relationship, if any, between the parties hereto, to the contrary notwithstanding, the processor expressly disclaims possession by it of any rights with respect to the carrier, except the rights conferred by law upon one who has made a contract with an independent contractor, and the carrier likewise expressly disclaims possession of any rights in respect to the processor, except those to which an independent contractor is entitled by law."

The contract also provided that the carrier must comply with applicable governmental rules and regulations pertaining to such hauling, and the established hauling rates, which cannot be changed by the carrier without the prior written approval of the shippers. The contract was returned to the Dairy after it was signed, and Komro has never had a copy of the contract in his possession. All drivers who haul for the Dairy operate under similar contracts.

Although the truck itself is owned by Komro, the bulk tank on the truck is the property of the Dairy, and bears the legend "Bulk Tank Cooled Milk for Rochester Dairy," and also the trade name of the Dairy. Komro's name appears in print on the doors of the truck, and he is not charged anything for the use of the tank. Komro is paid by the Dairy, who deducts hauling charges from the farmers' milk checks, pursuant to their authorization. No taxes or social-security payments are withheld from Komro's pay.

Komro hauled the milk to the Dairy's receiving station at Arkansaw, Wisconsin, until December, 1959. At that time the Arkansaw station was abandoned and Komro began hauling directly to the Dairy's plant at Rochester, Minnesota. The Dairy began to pay him an additional .08 per hundredweight for this extra service, although the arrangement remained the same in all other respects. The hauling from

Arkansaw to Rochester formerly had been performed by Dairy employees who worked regular eight-hour shifts, and were paid by Dairy checks with the usual payroll deductions taken out. Komro's time is his own on his route, as long as he makes the deliveries required by the contract, and he hires substitute drivers which he pays on his own. Komro withholds federal income taxes and social-security payments from the substitute drivers' wages. Komro wears no uniform, and pays all the truck expenses himself.

An affidavit was submitted by Arthur Anderson, a field-service director for the Dairy in which he alleged that the patrons are serviced and advised by fieldmen, who also solicit new business. Anderson also stated that the purchase of a truck and route does not bind the Dairy to enter into a hauling contract with the purchaser—although it is the usual practice to do so. Anderson stated that the driving practices of contract haulers, and the order in which they service their patrons, are not controlled or subject to surveillance by the Dairy. He also stated that the bulk tank trucks may be and are used by the haulers for purposes other than hauling milk so long as such use does not interfere with sanitation requirements.

One of the affidavits submitted in opposition to the Dairy's motion for summary judgment was that of one of the attorneys for the plaintiffs-appellants. The affidavit sets forth statements of one Decker Taylor, who had been employed by the Dairy as a field representative until March, 1962. The affidavit states that although Taylor declined to sign the affidavit he stated that if subpoenaed to testify, he would testify to certain facts which are set forth in the affidavit. According to Taylor, he was required to ride with each milk hauler on his route at least once a month to inspect his equipment and generally observe how he was discharging his responsibilities. Komro was one of the haulers working in Taylor's territory during his employment with the Dairy.

The plaintiffs-appellants also submitted several affidavits from farmer-patrons on Komro's route. The farmers all stated that they have no choice as to who hauls their milk; that all arrangements as to prices, pickup and delivery, etc., are made with the Dairy and that they rely on the Dairy to be responsible for the safe hauling of their milk and to control the drivers.

The Dairy's motion for summary judgment was based upon three separate grounds: (1) That Komro was an independent contractor at the time of the collision; (2) that the court did not have jurisdiction over the person of the Dairy for the reason that it is engaged only in isolated activities within the state; and (3) that the causes of action sought to be asserted by plaintiff special administrator do not exist under Minnesota law. The trial court found that the Dairy was engaged in substantial activities within the state and that the court therefore had jurisdiction over the person of the Dairy; and also that Komro was an independent contractor. Nothing was said in the court's memorandum decision concerning the existence of a cause of action in the special administrator under Minnesota law.

(1) *Propriety of summary judgment.* On summary judgment, if the material facts are not in dispute and if the inferences which may reasonably be drawn from the facts are not doubtful and lead to only one conclusion, then only a matter of law is presented which should be decided upon the motion. *Bond v. Harrel* (1961), 13 Wis. (2d) 369, 372, 108 N. W. (2d) 552; *Rabinovitz v. Travelers Ins. Co.* (1960), 11 Wis. (2d) 545, 105 N. W. (2d) 807; *Voysey v. Labisky* (1960), 10 Wis. (2d) 274, 103 N. W. (2d) 9.

Appellants contend that there were three issues of fact raised in the instant action: (1) Whether the contract between Komro and the Dairy applied to the work being done at the time of the collision; (2) whether the contract was a sham and ignored in the actual work; and (3) whether there

existed established work practices inconsistent with the terms of the contract relating to Komro's status. The appellants do not claim that the facts are in conflict, their position is that the affidavits state facts which give rise to conflicting inferences, and that the inferences to be drawn from these facts are for the trier of fact and not to be disposed of upon affidavits. Several cases are cited by appellants for the rule that where different inferences may reasonably be drawn from the evidence, it is the function of the trier of fact to draw such inferences—however none of these cases involved summary judgment.[1]

In passing on the question of Komro's status, the trial court had before it affidavits setting forth the facts surrounding the execution of the written contract, the terms of the written contract, the circumstances surrounding the oral agreement, the terms of the oral agreement, and the time and place of the accident with reference to Komro's hauling activities. The contract imposes certain responsibilities upon the hauler—among them carrying suitable cargo and liability insurance, maintenance of the bulk tanks and pick up equipment, conformance with sanitary and health requirements, etc.,—and the fact that the Dairy may have required a fieldman to examine the manner in which such responsibilities were being carried out does not conflict with the relationship established by the contract.

In the instant action, the material facts are not in dispute, and the inferences which may reasonably be drawn therefrom

[1] *Sprecher v. Roberts* (1933), 212 Wis. 69, 248 N. W. 795, was an appeal from a judgment entered upon a jury verdict in a personal-injury action; *Estate of Miller* (1953), 265 Wis. 420, 61 N. W. (2d) 813, was a contested-will case which had proceeded to trial, and where the appeal was taken from the judgment admitting the will to probate; *Estate of Beale* (1962), 15 Wis. (2d) 546, 113 N. W. (2d) 380, also involved a contested will where the case had proceeded to trial; *Carstensen v. Faber* (1962), 17 Wis. (2d) 242, 116 N. W. (2d) 161, was an action for wrongful death where the appeal was from a judgment entered upon a jury verdict.

are not doubtful as to the issues presented. Therefore, there remains only a question of law to be determined, which could properly be resolved on summary judgment.

(2) *Whether Komro was an independent contractor.* This issue raises two distinct problems: First, the choice of the applicable substantive law (Wisconsin law or Minnesota law); and secondly, the application of that law to the facts. The trial court determined that it had jurisdiction for the reason that the Dairy is engaged in substantial activities in this state within the purview of sec. 262.05 (1) (d), Stats.,[2] and the facts as to the Dairy's business activities in Wisconsin are adequate to support the trial court's determination.

Thus, Wisconsin is the state of the forum and also the domicile of Komro and the plaintiffs-appellants; and Minnesota is the state where the wrong occurred, and the domicile of the Dairy. The Dairy contends that the issue of vicarious liability is to be determined by the law of the place of the wrong.

It is not necessary to reach the question of which law applies, however, for an examination of authorities from both states reveals that there is no practical difference between the Wisconsin and Minnesota rules on the question of employee versus independent contractor.

In Minnesota the "real test" of the distinction between an employee and an independent contractor is said to be the right of control—not merely over what is to be done, but primarily over how it is to be done. *Nicholas v. Hennepin*

---

[2] "PERSONAL JURISDICTION, GROUNDS FOR GENERALLY. A court of this state having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to s. 262.06 under any of the following circumstances:

"(1) *Local presence or status.* In any action whether arising within or without this state, against a defendant who when the action is commenced: . . .

"(d) Is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise."

*Wheel Goods Co.* (1953), 239 Minn. 269, 273, 58 N. W. (2d) 572, 575. See also *Frankle v. Twedt* (1951), 234 Minn. 42, 47, 47 N. W. (2d) 482, 487, where the Minnesota court stated that the distinction between an employee and an independent contractor is basically "the distinction between a person who is subject to orders as to how he does his work, and one who agrees only to do the work in his own way." Other factors considered by the Minnesota court in determining the question are: Control over the means of performance; the nature of the work; supervision of work; furnishing of personnel and material; method of payment; freedom of the contractor in employment policy; and procurement of insurance covering personnel, social-security payments, and like items. *Gill v. Northwest Airlines, Inc.* (1949), 228 Minn. 164, 169, 36 N. W. (2d) 785, 788, and cases therein cited.

In Wisconsin the principal point of distinction between an employee and an independent contractor is held to be "the degree of retention by the employer or principal of the right to control the manner in which the details of the work were to be done." *Harris v. Richland Motors* (1959), 7 Wis. (2d) 472, 476, 96 N. W. (2d) 840; *Swedowski v. Westgor* (1961), 14 Wis. (2d) 47, 53, 109 N. W. (2d) 549. The contract between Komro and the Dairy was obviously drawn with the purpose of creating the status of independent contractor. This intention is clearly evidenced by the concluding provisions which state that the intent and meaning of the contract is that the carrier shall have complete liberty as to the method and manner of his performance without any right whatever on the part of the Dairy to direct or control his performance in any way; and that each party disclaims any rights with respect to the other except those rights consistent with relationship of an independent contractor.

An examination of the Dairy's various levers of control reveals that none of these factors relate to Komro's operation of the truck on his route. Komro was free under the terms of the agreement to adopt his own techniques as to the manner in which he carried out his duties; he was free to hire such help as he deemed necessary; he was free to work out his own route of travel; he owns the truck and is responsible for keeping it in repair; he carries liability insurance as well as insurance on the truck and on the cargo; the Dairy makes no deductions from his compensation for taxes or social security; Komro hires and pays his own help; his driving practices are not controlled or subject to surveillance by the Dairy and the maintenance and repair of the truck and other equipment is Komro's responsibility. The accident occurred while Komro was operating the truck upon the highways, and was not at all connected with the physical processes of pickup and delivery. The affidavits established that the manner in which Komro operated the truck was not subject to surveillance or control by the Dairy.

The appellants set forth several aspects of the relationship claimed to have the effect of rendering Komro an employee. Among these are the facts that: He could be fired by the Dairy on thirty days' notice; he had to make prompt delivery; he could not add or subtract patrons; he did not own the tank; he did not fix his own fees with the patrons; and he kept no records. None of these factors are inconsistent with the status of an independent contractor. The only real control exercised by the Dairy was over the end result (*e.g.*, prompt delivery, etc.), not over the details of the work.

The appellants also contend that the details of the instant action are highly similar to the details held sufficient to constitute an employer-employee relationship in *Nestle's Food Co. v. Industrial Comm.* (1931), 205 Wis. 467, 237 N. W. 117. The *Nestle's Case,* however, was a proceeding before

the industrial commission under the workmen's compensation statutes. In such cases the question is whether the employer is liable for injuries suffered by the employee. The liability stems from statute, and the statutes contain lengthy definitions of the term "employee." Vicarious liability, on the other hand, is a common-law concept imposing liability on the employer for injuries suffered by third parties as a result of the employee's conduct.

In any event, the *Nestle's Case* appears to rest upon the idea that (pp. 471, 472), "the company never surrendered any of its right to control the essential and important things in which it was interested, to wit, prompt and proper delivery of the milk, . . ." and the court stated that the hauler "was required to make deliveries promptly and according to the wishes of the company." In the instant action Komro was not under the control of the Dairy as to the manner in which he carried out his rounds; the only stipulation was that he make prompt delivery—taking into consideration the perishable nature of the milk. The sole emphasis in the *Nestle's* decision is on the end result of the work (*e.g.*, prompt delivery), and to this extent the case is inconsistent with later holdings of this court to the effect that the principal point of distinction between an employee and an independent contractor is the degree to which the principal has retained the right to control the manner in which the details of the work are to be done. See *Harris v. Richland Motors* and *Swedowski v. Westgor, supra.*

In the instant action, Komro had complete control over the operation of the truck. He could drive in the manner in which he saw fit, and he was free to take whatever route of travel he wished. He can, and does, hire substitute drivers to cover portions of the route for him, and he pays these drivers himself. The collision out of which the action arose occurred while Komro was operating the truck on the high-

ways, and the Dairy had no control over this portion of his work.

It follows that the trial court properly determined that Komro was an independent contractor. Because of the dismissal of the action against the Dairy, other contentions raised by the Dairy on the appeal become moot.

*By the Court.*—Judgment affirmed.